STOUT v. STATE *ex rel.* CALDWELL.

No. 1781.   Opinion Filed February 11, 1913.

Rehearing Denied February 14, 1913.

(130 Pac. 553.)

1.   **INTOXICATING LIQUORS—Action—Use of Premises—Proceeding for Penalty—Nature and Form.** Section 4191, Comp. Laws 1909, provides as the punishment of one who uses or permits his premises to be used for violating the prohibition law both fine and imprisonment and a penalty. Held:

(a)  That the proceeding to recover the penalty is the punishment of an offense.

(b)   That while this proceeding punishes an offense, it at the same time is in the nature of a civil action and is governed by the rules of procedure applicable to civil instead of criminal cases.

2.   **CONSTITUTIONAL LAW**—Construction and Operation of Constitution—Persons Entitled to Raise Constitutional Question.   A defendant, sued for the penalty provided by section 4191, Comp. Laws 1909, for unlawfully permitting his premises to be used in violation of the prohibition law, may plead that the statute is invalid because in conflict with the former jeopardy section of the Constitution, although he has not been previously prosecuted for the crime pronounced by the statute.

3.   **CRIMINAL LAW**—"Jeopardy"—Similar Expressions.   The terms "jeopardy of life and liberty for the same offense," "jeopardy of life or limb," "jeopardy for the same offense," "twice in jeopardy of punishment," and other similar provisions used in the various Constitutions, are to be construed as meaning substantially the same thing.

4.   **SAME**—Proceeding for Penalty.   Article 2, sec. 21, of the Constitution (Williams' Ann. Const. Okla., sec. 29), which provides, "Nor shall any person be twice put in jeopardy of life and liberty for the same offense," is not intended to apply to a civil proceeding which affects merely property rights, even though such proceeding is in part a punishment of an offense.

5.   **CONSTITUTIONAL LAW** — Determining Constitutionality of Statute—Presumption.   An act of the Legislature will not be declared unconstitutional unless its conflict with the Constitution is clear and certain.

6.   **CRIMINAL LAW** — Former Jeopardy—Penalty.   Section 4191, Comp. Laws 1909, imposing, as the penalty for the offense there described a penalty to be recovered at the suit of the state, and a fine and imprisonment to be administered in a criminal prosecution, is not in conflict with article 2, sec. 21, of the Constitution, which provides, "Nor shall any person be twice put in jeopardy of life and liberty for the same offense."

7.   **SAME**—Constitutional and Statutory Provisions—Punishment for Offenses.   The fact that the Constitution prescribes the punishment for the sale of intoxicating liquors does not prevent the Legislature from imposing other and different or greater punishment for using or permitting one's premises to be used for the sale of intoxicating liquors, as the two offenses are separate and distinct and require different proof to support them.

(Syllabus by Ames, C.)

*Error from District Court, Oklahoma County;*
*R. H. Loofbourrow, Assigned Judge.*

Action by the State, on the relation of Fred S. Caldwell, counsel to the Governor, against D. C. Stout, to recover a penalty

for using certain premises in Oklahoma City for the purpose of unlawfully disposing of intoxicating liquors. Judgment for plaintiff for $500, and defendant brings error. Affirmed.

*Kistler, McAdams & Haskell,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Jos. L. Hull,* Asst. Atty. Gen., for defendant in error.

Opinion by AMES, C. On the petition for rehearing our attention was first called to the contention that section 4191, Comp. Laws 1909, is in conflict with article 2, sec. 21 (Williams' Ann. Const. Okla., sec. 29) of the Constitution, prohibiting twice placing any person in jeopardy for the same offense, and we granted the petition in order that this position might be fully examined. We have been assisted in this examination by careful briefs and oral argument, and have given the subject a painstaking investigation, having carefully examined the authorities cited by counsel and many others disclosed by our own researches. Section 4191 is as follows:

"It shall be unlawful for the owner or owners of any real estate, building, structure, or room to use, rent, lease, or permit the same to be used for the purpose of violating any provision of this act. Any person who shall willfully violate the provisions of this section shall be guilty of a misdemeanor, and in addition thereto shall be liable to a penalty of not less than one hundred dollars, nor more than one thousand dollars for each offense, to be recovered at the suit of the state. The penalty so recovered shall become a lien on the property and premises so used, leased or rented in violation of this act from and after the date of the filing of the suit to recover such penalty, and the filing of a notice of the pendency of such suit with the register of deeds of the county wherein said property is located, and upon final judgment said property may be sold as upon execution to satisfy the same, together with costs of suit; provided, however, that such lien shall not attach to property under the control of any receiver, trustee, guardian or administrator; but in such case the receiver, trustee, guardian or administrator shall be liable, on his official bond, for the penalty so incurred, and in addition thereto shall be guilty of a misdemeanor. Each day such property is so used, leased or rented for any such unlawful purpose shall constitute a separate offense, and the penalty herein pre-

scribed shall be recovered for each and every such day. All leases between landlords and tenants under which any tenant shall use the leased premises for the purpose of violating any provision of this act, shall be wholly null and void, and the landlord may recover possession thereof as in forcible entry and detainer."

The offense charged against the defendant under this statute is using his premises for the purpose of selling and otherwise illegally furnishing spirituous, vinous, fermented, and malt liquors, and permitting his premises to be used for such purposes. It will be noticed that any person who willfully violates the provisions of this section is guilty of a misdemeanor, and in addition thereto is liable to a penalty of not less than $100 nor more than $1,000 for each day during which the property is so used. The punishment for the misdemeanor is a fine of not less than $50, nor more than $500, and imprisonment not less than 30 days, nor more than six months. Section 4206, Comp. Laws 1909. The punishment therefore, for a violation of the section involved, is fine and imprisonment and penalty. It will be observed that the statute uses the expression, "and in addition thereto," so that the punishments are concurrent, and not severable, and if one can be imposed all must be imposed. The punishment for the misdemeanor is administered in a criminal prosecution, while the penalty is collected in a suit brought by the state. Both sides agree that it requires two proceedings to complete this punishment, one criminal, and one in the nature of a civil action, and we concur in this agreement; so that the question presented is whether or not, for the punishment of a crime, a man may be twice tried. It will also be observed that this statute imposes both punishments for the same offense. It is not a case of the same acts constituting different offenses, or offenses against different governments. The constitutional provision referred to is as follows (article 2, sec. 21, of the Constitution; Williams' Ann. Const. Okla., sec. 29):

"No person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided; nor shall any person, after having been once acquitted by a jury, be again put in jeopardy of life or liberty for that of

which he has been acquitted. Nor shall any person be twice put in jeopardy of life and liberty for the same offense."

First. This proceeding to recover the penalty is the punishment of an offense, or at least a part of it.

On this point the opinion of this court in *C., R. I. & P. Ry. Co. v. Ter. of Okla.*, 25 Okla. 238, 105 Pac. 677, is conclusive. That was a proceeding in the nature of a civil action, instituted against the railroad to recover the' statutory penalty for accepting and receiving quail for the purpose of transportation. The quail were received in Blaine county and transported through Garfield county, where the suit was brought. The organic act of Oklahoma Territory provided that "all offenses committed in said territory, if committed within any organized county, shall be prosecuted and tried within said county,"· and it was argued by the railway company that the suit should have been brought in Blaine county, as it was the prosecution of an offense, although it was in the form of a civil action. This position was upheld by the court upon the authority of *United States v. Chouteau,* 102 U. S. 603, 26 L. Ed. 246; *Huntington v. Attrill,* 146 U. S. 657, 13 Sup. Ct. 224, 36 L. Ed. 1123; *A., T. & S. F. R. Co. v. State,* 22 Kan. 1.

Second. While this is a proceeding to punish an offense, at the same time it possesses many of the attributes of a civil action.

Its ultimate object is the recovery of a money judgment, and it cannot at any time result in depriving the defendant of life or liberty, but merely of property. It is governed by the rules of procedure in civil instead of criminal cases, and would not require evidence beyond a reasonable doubt to support it, or a unanimous verdict, or the other peculiar classes of protection which are thrown around those whose life or liberty is at stake. *In re Seagraves,* 4 Okla. 422, 48 Pac. 272, held that an action to recover a penalty for intruding within the Indian country cannot be enforced by a criminal proceeding. This subject has recently received a careful consideration in *Hepner v. U. S.,* 213 U. S. 103, 29 Sup. Ct. 474, 53 L. Ed. 720, 27 L. R. A. (N. S.) 739, 16 Ann. Cas. 960, which was an action to recover the penalty

prescribed by statute for inducing an alien to migrate to the United States for the purpose of performing labor there. The United States Circuit Court of Appeals for the Second Circuit certified the question to the Supreme Court to determine whether or not in an action to recover this penalty, where the evidence was sufficient, the court should instruct the jury to return a verdict for the United States, and the court held that the action to recover the penalty was not so far criminal in its nature as to prevent the direction of a verdict for the government, citing in support of its conclusion *Stockwell v. United States,* 13 Wall. 531, 20 L. Ed. 491; *Jacobs v. United States,* 1 Brock. 520, Fed. Cas. No. 7,157; *Stearns v. United States,* 2 Paine, 300, Fed. Cas. No. 13,341; *United States v. Mundell,* 1 Hughes, 415, Fed. Cas. No. 15,834; *United States v. Younger* (D. C.) 92 Fed. 672; *United States v. B. & O. S. W. R. Co.,* 86 C. C. A. 223, 159 Fed. 33; *Hawlowetz v. Kass,* 32 Blatchf. 395, 25 Fed. 765; *United States v. Zucker,* 161 U. S. 475, 16 Sup. Ct. 641, 40 L. Ed. 777. The cases of *Boyd v. United States,* 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, and *Lees v. United States,* 150 U. S. 476, 14 Sup. Ct. 163, 37 L. Ed. 1150, are cited and limited in their application to the exact point there decided, namely, that such an action was so far criminal in its nature as to prevent the defendant from being compelled to testify against himself.

The Zucker case, 161 U. S. 475, 16 Sup. Ct. 641, 40 L. Ed. 777, was a suit to recover the value of merchandise alleged to have been forfeited to the United States under the Act of June 10, 1890, c. 407, sec. 9, 26 St. at L. 131 (U. S. Comp. St. 1901, p. 1895), which provided for the forfeiture of the merchandise and punishment by fine or imprisonment. This act, therefore, is quite closely related to the one under review, because both involve the penalty plus criminal punishment. It was held that depositions could be used over the objections of the defendants, notwithstanding the sixth amendment, which would have entitled the defendants to have been confronted in court with witnesses against them, if the case had been criminal.

In an extensive note in connection with the report of the Hepner case, 27 L. R. A. (N. S.) 739, the annotator, at page 743, says:

"In examining the cases collected in this note, it will be observed that those holding the action to be civil in nature rather than criminal—whether the offense is public or private—largely preponderate, and this would seem to be the better rule. The exceptions to the ordinary rules of procedure in favor of the accused on trial for a crime are believed to have arisen because of the fact that the defendant's life or liberty was at stake. So sacred was this individual right to life and liberty held that it gave rise to the maxim of the English law that it is better that ten guilty persons escape than one innocent suffer. Possibly some of the rules of criminal procedure also arose because, at common law, the accused, singularly enough, was not allowed counsel. But it can scarcely be doubted that the rules formulated to shield the one innocent person, although ten guilty ones might thereby go free, would not have been adopted had the only inconvenience suffered by a person convicted of crime been a pecuniary loss. The ancient pains and penalties for criminal acts were severe in the extreme, and might well justify a merciful procedure, whereas, had the penalty been a mere loss of property, it would hardly have called for a procedure different from that provided where the penalty would be a loss of property for any other wrong. Nor will the fact that a person's character is involved in a charge of violating a penal statute furnish a sufficient justification for a resort to criminal trial rules; for is not a defendant's character as much involved in a civil action for damages for assault and battery as in a criminal prosecution for the same offense? It would seem, therefore, that no sufficient reason has been shown for adopting rules of criminal procedure in actions to recover statutory penalties. The penalty, broadly speaking, is a pecuniary one, the same as it is in any private action between individuals, and is no more a punishment—except, perhaps, in degree—so far as it bears upon the individual punished, than is the pecuniary loss imposed for any other wrong. The sum of money recovered may go to an individual, as compensation for an injury, or it may go to the state, as a penalty for a public offense; but the result is the same to the defendant—the loss of property to the extent of the penalty. If a preponderance of evidence is enough to establish the wrong in one case, it ought to be sufficient to prove the offense in the other. There would appear to be no more reason why a defendant in an action to recover a statutory penalty should be entitled to the privileges of one accused of crime than would be the defendant in an action for damages for a negligent killing, because the negligence amounted to manslaughter. That the action for a statutory pen-

alty is civil in nature has the support of a large majority of the cases in which the question has been squarely presented."

Third.    Having now determined that this proceeding, while designed to punish an offense, has for its object a mere money recovery, and is governed by the rules of procedure affecting civil cases, we now reach the inquiry whether or not the effect of the statute is to twice put the defendant in jeopardy of life and liberty for the same offense.

At the threshold of this inquiry, we are met with the objection that the defendant is not in position to plead former jeopardy, because it does not appear that he has ever been prosecuted criminally, and that therefore there has been no previous jeopardy to plead.    In support of this position our attention is called to the case of *Shevlin-Carpenter Co. v. Minnesota,* 218 U. S. 57, 30 Sup. Ct. 663, 54 L. Ed. 930, where it is said:

"Replying to the contention that to sustain this action would subject plaintiffs in error to the jeopardy of a second punishment, the court said that plaintiffs in error were 'probably a little premature in raising the point.'    And further said, 'It might come with some force if presented in a criminal prosecution after recovery in a civil action.'    In this we concur.    In other words, plaintiffs in error . cannot base a defense upon an anticipation of what may never occur.    To permit this would discharge them from all liability, for the defense, if good at all, would be good against whatever action might be brought.    Necessarily there must be a first jeopardy before there can be a second, and only when a second is sought is the constitutional immunity from double punishment threatened to be taken away.    An occasion for the defense of double jeopardy may occur if the state of Minnesota should proceed criminally against plaintiffs in error.    We do not mean to say, however, that it will be justified.    We do not mean to say that the state law subjects an offender against its provisions to a double jeopardy."

This argument, however, does not impress us as conclusive, and, as it was not the deciding point in that case, we do not believe it is the expression of the matured opinion of that court.    It will be remembered that this is a suit to recover a statutory penalty.    The penalty is prescribed by the statute and can be recovered only by virtue of the statute.    If the statute is invalid, then no penalty can be recovered.    If the statute is valid,

then the penalty can be recovered, and the fine and imprisonment not only can, but must, be imposed.    So that the question is not whether there has been an actual former jeopardy, but whether there is a valid statute upon which this action can be maintained. If the statute is in conflict with the Constitution. it is invalid.    It does not exist.    It is  as if it were not, and therefore no action can be maintained under it.    While, if it is valid, both actions must be maintained.    The failure of the public officers to discharge a duty which the statute imposes upon them cannot improve the statute—cannot give life to that which is dead.    The statute must, of course, be tested by its own requirements, and not by what public officials have done in the past.    *Board of Education v. Aldredge,* 13·Okla. 205, 73 Pac. 1104; *Fisher v. McGirr,* 1 Gray (Mass.) 1, 61 Am. Dec. 381; *Henderson v. Atlantic City,* 64 N. J. Eq. 583, 54 Atl. 533; *State v. Stark County,* 14 N. D. 369, 103 N. W. 913; *Dexter v. Boston,* 176 Mass. 247, 57 N. E. 379, 79 Am. St. Rep. 306.

We therefore proceed to an examination of the statute, to ascertain whether it is in conflict with the former jeopardy provision of our Constitution.    The particular language which is relied upon as destroying the statute reads as follows:

"Nor shall any person be twice put in jeopardy of life and liberty for the same offense."

When our Constitution was adopted, similar provisions had been in the Constitutions of the United States and of the other states for many generations, and various phrases are used to express the same idea.    The Constitution of the United States provides:

"Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."    (Fifth Amendment.)

Other Constitutions using the expression, "life or limb," are Alabama (the same language being found in its Constitutions of 1819, art. 1, sec. 13; 1865, art. 1, sec. 10; 1868, art. 1, sec. 11; 1875, art. 1, sec. 10; and 1901, art. 1, sec. 10); Delaware (article 1, sec. 8, Const. 1792, the same language being in its Constitutions of 1831 and 1897); Kentucky (Constitutions 1792, art. 12, sec. 12; 1799, art. 10, sec. 12; 1850, art. 13, sec.

14; and 1890, sec. 12); Maine (Dec. of Rights, sec. 8, Const. 1819); Pennsylvania (article 1, sec. 10, Const. 1873, and same in Consts. 1838 and 1790, art. 9, sec. 10); Tennessee (article 1, sec. 10, Const. 1870, same in Consts. 1834 and 1796). The following states use the expression, "life or liberty": Georgia (article 1, sec. 8, Const. 1877, and same in Consts. 1868 and 1865, art. 1, sec. 9); South Carolina (article 1, sec. 17, Const. 1895). The following states use the expression, "twice put in jeopardy for the same offense": California (article 1, sec. 13, Const. 1879, and same in Const. 1849, art. 1, sec. 8); Colorado (article 2, sec. 18, Const. 1876); Idaho (article 1, sec. 13, Const. 1889); Indiana (article 1, sec. 14, Const. 1851, and same in Const. 1816, art. 1, sec. 13); Montana (article 3, sec. 18, Const. 1889); Nevada (article 1, sec. 8, Const. 1864); North Dakota (article 1, sec. 13, Const. 1889); Ohio (article 1, sec. 10, Const. 1851, same in Const. 1802, art. 8, sec. 11); Oregon (article 1, sec. 12, Const. 1857); South Dakota (article 6, sec. 9, Const. 1889); Utah (article 1, sec. 12, Const. 1895); Virginia (article 1, sec. 8, Const. 1902); Washington (article 1, sec. 9, Const. 1889); Wyoming (article 1, sec. 11, Const. 1889).

Michigan (article 1, sec. 12, Const. 1835), Minnesota (article 1, sec. 7, Const. 1857), and Wisconsin (article 1, sec. 8, Const. 1848) use the expression, "twice in jeopardy of punishment." New Hampshire, in its Constitutions of 1874 (article 1, sec. 16), 1892 (part 1, art. 16), and 1902, uses the expression, "tried after an acquittal for the same crime or offense," and New Jersey has substantially the same provision (article 1, sec. 10, Const. 1844). Arkansas first used the expression, "life or limb," and changed to, "life or liberty," in 1868 (article 1, sec. 9; Const. 1864, art. 2, sec. 12; Const. 1874, art. 2, sec. 8); Illinois in 1818, used the term, "life or limb" (article 8, sec. 11), and in 1870 changed to, "jeopardy for the same offense" (article 2, sec. 10, Const. 1870). Iowa's provision is substantially the same as that of New Hampshire (article 1, sec. 12, Consts. 1857 and 1846). In 1855 Kansas used the expression, "jeopardy for the same offense" (article 1, sec. 10, Const. 1855). In 1857 it changed to, "jeopardy of life, limb or liberty"

(section 10, Bill of Rights, Const. 1857). While in 1859 it returned to the expression, "jeopardy for the same offense" (article 1, sec. 10, Const. 1859). In 1868 Louisiana had the expression, "for the same offense" (article 6, tit. 1, Const. 1868). While in 1879 it changed to "jeopardy of life or liberty for the same offense," and this was followed in 1879 (article 9, Bill of Rights). In 1817, in Mississippi, the expression, "life or limb," was used (article 1, sec. 13, Const. 1817), while in 1868 it was changed to, "jeopardy for the same offense" (article 1, sec. 5), and this was followed in 1890 (article 3, sec. 22). In 1820 Missouri used the term, "life or limb" (article 13, sec. 10), while it changed to, "life or liberty," in 1865 (article 1, sec. 19), and followed this in 1875 (article 2, sec. 23). Nebraska started, in 1866, with the expression, "jeopardy of punishment" (article 1, sec. 8), and changed it in 1875 to, "twice put in jeopardy for the same offense" (article 1, sec. 12). In 1821 New York used the term, "life or limb" (article 7, sec. 7), and changed in 1846 to, "jeopardy for the same offense" (article 1, sec. 6), which it followed in 1894 (article 1, sec. 6). In 1842 Rhode Island used the term, "after an acquittal, be tried for the same offense" (article 1, sec. 7), while in 1868 it changed it to, "jeopardy of his life or liberty" (article 1, sec. 18). In 1836 Texas used the term, "jeopardy of life or limbs" (section 9, Bill of Rights), which it subsequently changed to, "jeopardy of life or liberty" (article 1, sec. 14, Const. 1876). West Virginia started with, "jeopardy for the same offense" (article 2, sec. 2, Const. 1861), which it subsequently changed to, "jeopardy of life or liberty for the same offense" (article 3, sec. 5, Const. 1872). Connecticut does not seem to have any constitutional expression on the subject, although it is treated in that state as a fundamental principle of the common law that no person shall be subject for the same offense to be twice put in jeopardy. *State v. Lee,* 65 Conn. 265, 30 Atl. 1110, 27 L. R. A. 498, 48 Am. St. Rep. 202.

These various constitutional provisions apparently are treated by the courts as meaning the same thing; the difference in phraseology not being discussed in the cases which we have examined. Indeed, it is assumed by the Supreme Court of the United States,

in the case of *Trono v. United States,* 199 U. S. 521, 26 Sup.
Ct. 121, 50 L. Ed. 292, 4 Ann. Cas. 773, that the term, "life or
limb," in the Constitution of the United States, has the same
meaning as, "no person for the same offense shall be twice put
in jeopardy of punishment," in the Act of July 1, 1902, c. 1369,
32 St. at L. 691, providing for the rights of persons accused of
crime in the Philippine Islands, and, "jeopardy for the same
offense," in the New York Constitution. Dissenting opinions
were filed in this case by Mr. Justice Harlan and Mr. Justice
McKenna, and in neither of them is a distinction drawn between
the phrases. The case of *Kepner v. United States,* 195 U. S.
100, 24 Sup. Ct. 797, 49 L. Ed. 114, 1 Ann. Cas. 655, in which
dissenting opinions were filed by Mr. Justice Holmes and by Mr.
Justice Brown, further emphasizes the fact that that court treats
as identical these various constitutional phrases. We therefore
conclude that no particular significance is to be given to the
term, "life or liberty," in our Constitution, but that it has sub-
stantially the same meaning as the various other forms of ex-
pression which are contained in other Constitutions and Bills
of Rights.

In the early English law, it was a very usual form of punish-
ment to take the limb of a defendant and it is doubtless this fact
that caused the early expression, "life or limb." Sir James Fitz-
james Stephen, in speaking of early English punishments, says
(History of the Criminal Law of England, vol. 1, pp. 58, 59) :

"The punishment upon a second conviction for nearly every
offense was death or mutilation. In Ethelred's laws it is said
of the accused when ultimately convicted, 'Let him be smitten so
that his neck break.' The laws of Cnut lay down the principles
on which punishment should be administered, and also regulate
the practice of the court. The principle is thus stated : 'Though
any one sin, and deeply foredo himself, let the correction be
regulated so that it be becoming before God and tolerable before
the world. And let him who has power of judgment very ear-
nestly bear in mind what he himself desires when he thus says,
"*et dimitte nobis debita nostra sicut et nos dimittimus.*" And we
command that Christian men be not on any account for alto-
gether too little condemned to death; but rather let the gentle
punishments be decreed for the benefit of the people; and let

not be destroyed for little God's handiwork, and his own pur-
chase which he dearly bought.' The practice of the courts is
regulated by the following enactment: 'That his hands be cut
off, or his feet, or both, according as the deed may be. And if
he have wrought yet greater wrong, then let his eyes be put out,
and his nose, and his ears, and his upper lip be cut off, or let
him be scalped; whichever of these those shall counsel whose
duty it is to counsel thereupon so that punishment be inflicted,
and also the soul be preserved.' "

In volume 2 of Pollock & Maitland's History of English
Law, pp. 452, 453, it is said:

"When punishment came it was severe. We read of death
inflicted by hanging, beheading, burning, drowning, stoning, pre-
cipitation from rocks; we read of loss of ears, nose, upper lip,
hands and feet; we read of castration and flogging and sale into
slavery; but the most gruesome and disgraceful of these tor-
ments were reserved for slaves. Germanic law is fond of 'char-
acteristic' punishments; it likes to take the tongue of the false
accuser and the perjurer's right hand. It is humorous; it knows
the use of tar and feathers. But the worst cruelties belong to the
politer time."

As the methods of punishment grew less cruel with the de-
velopment of civilization, the deprivation of limb was abandoned;
but the phrase continued to live, with its meaning modified ac-
cording to the refinements of civilization, so that, in broad terms,
the doctrine may be said to mean that no man who has once been
convicted or acquitted of an offense shall again be tried or pun-
ished for the same offense, and the question for our consideration
is whether our statute which provides a penalty to be recovered
in an action by the state, and fine and imprisonment to be re-
covered in a criminal prosecution, can be administered with-
out violating this fundamental doctrine.

It is impossible to trace the doctrine to any distinct origin.
It seems to have been always embedded in the common law of
England, as well as in the Roman law, and doubtless in every
other system of jurisprudence, and, instead of having a specific
origin, it simply always existed. It seems to us to occupy a sim-
ilar position in the criminal law to that covered by the doctrine of
*res judicata* in the civil law, the one resting on the maxim, "*Nemo*

*debet bis vexari pro una et eadem causa"* (Broom's Legal Maxims [8th Ed.] p. 327), and the other resting upon the maxim *"Nemo debet bis puniri pro uno delicto"* (Broom's Legal Maxims [8th Ed.] p. 348).

Bearing in mind that the maxim has always been recognized, we may throw some light upon its meaning by an examination of the punishment for crime which coexisted with the maxim from the earliest days in England until 1870, and the effect of a conviction upon the defendant's property rights. Broadly stated, the effect of a conviction for felony from the earliest time in England was a forfeiture of all of the defendant's property. The rule is stated by Stephen (volume 1, Hist. of the Criminal Law of Eng., pp. 487, 488) as follows:

"One other consequence of treason and felony remains to be noticed. This is corruption of blood and forfeiture of property. The effect of corruption of blood was that descent could not be traced through a person whose blood was corrupted. Also his real property escheated to the lord of the fee or the king. The personal property of a traitor or felon was forfeited, not by his attainder, but by his conviction. These incidents of treason and felony have their source in the feudal theory that property, especially landed property, was held of a superior lord upon the condition of discharging duties attaching to it, and was forfeited by the breach of those conditions. They have no history at all, but prevailed from the earliest time till the year 1870, when they were abolished by 33 & 34 Vic. c. 23, sec. 1, except in the case 'of forfeiture consequent upon outlawry.' "

The theory of the law was that all land is held of some lord; that if the tenant died without heirs the lord should have back again that which he gave to the tenant; that when the tenant committed certain classes of crime, which gradually became known as felonies, his blood was corrupted, the bond between him and his lord was broken, he forfeited the property, and, his blood being corrupt, his heirs could not take through it, and the doctrine of corruption of blood continued in England until the Inheritance Act of 1834, which modified it, and it was abolished in 1870. 3 Holdsworth, History of English Law, pp. 61-64; 2 Pollock & Maitland's History of English Law, p. 466, together with the general discussion of the subject commencing at page 448. We

do not know just when this practice originated, but it is apparent from chapter 32 of Magna Charta that it was well established in the law prior to that time, and the only effect of Magna Charta upon the forfeiture was to regulate the division of the real estate as between the king and the feudal lord; that chapter providing:

"We will not retain beyond one year and one day the lands of those who have been convicted of felony, and the lands shall thereafter be handed over to the lords of the fiefs."

An excellent historical treatment is contained in McKechnie's Magna Charta discussing this chapter, at pages 394-401. There is no reference in Magna Charta to the subject of former jeopardy.

We have therefore two principles of law standing side by side in the history of English jurisprudence, by one of which a person accused of crime is entitled to the plea of former jeopardy, or, as it was more usually expressed in England, "*autrefois acquit,*" or "*autrefois convict,*" and the other that the convicted defendant forfeited his entire estate, both real and personal, because of the conviction. As our doctrine is the doctrine of the common law, it is significant, in considering the question before us, that the punishment for the crime in the English law was always accompanied by the destruction of the defendant's real estate and all his property, and its forfeiture to the crown, or the feudal lord, and this is a very persuasive argument that the doctrine of former jeopardy has never had any relation whatever to the protection of a man's property. This position is rendered even stronger by the fact that corruption of blood and forfeiture of estate were abolished by constitutional provisions (article 2, sec. 15, of Oklahoma Constitution, and similar provisions in the Constitutions of other states), and it has never been thought that the former jeopardy provision had the effect of abolishing these incidents of conviction for felony.

Historically, therefore, and on principle, it would seem that this doctrine has no relation to a deprivation of property, but only to such a criminal punishment as might result in the deprivation of life or liberty. In other words, one is not placed

in "jeopardy" by a proceeding affecting only property rights. Indeed, it seems that at common law, to enforce the forfeiture and recover the property, a second action might be necessary. Sir Matthew Hale, in his Pleas of the Crown (volume 1, p. 242), says:

"The king at common law and by virtue of this statute was entitled to a right of entry, where the party was *in* merely by disseisin or abatement, but not to a right of entry, where the possessor was *in* by title; but at this day by virtue of the statute of 33 H. 8. above mentioned the king is entitled to a right of entry in both cases, and that without office, *but then there must be an inquisition or seizure to bring the king into the actual possession;* and if he grant it over before such seizure, the grant must be special, not of the land simply, but of the right to the land, otherwise neither land nor the right of entry passeth; it is so adjudged in Dowty's Case, 3 Co. Rep. 10b." (Italics ours.)

And again at page 363:

"The usage was always upon a presentment of homicide before the coroner, or of flight for the same, or *upon a conviction of felony* by the petit jury, or the finding of a flight for the same, *to charge the inquest or jury to inquire* what goods and chattels he hath, and where they are, and thereupon to charge the *villata* where such goods are with the goods to be answerable to the king. *Vide* 3 E. 3. Corone 296, & Alibi, *vide* statute 31 E. 3. cap. 3. But tho the goods of an offender be not forfeited till the conviction or flight found by inquest, yet whether they may be seised upon the offense committed, hath been controverted." (Italics ours.)

See, also, his history of the Freeman Sands case, at page 250, from which it appears that the king's attorney preferred an information against Sir George Sands, to have a conveyance of the land unto the king; Sir George in that case holding the land by a title which he claimed superior to that of the king under the forfeiture. It would seem, however, from the Act of 7 and 8 of George IV, c. 28, sec. 5, which provides "that where any person shall be indicted for treason or felony, the jury impaneled to try such person shall not be charged to inquire concerning his lands, tenements or goods, nor whether he fled for such treason or felony," that the custom prior to that time was for the same jury which tried the indictment to inquire concern-

ing his real and personal property, in order that forfeiture might be accomplished. 4 Blackstone's Commentaries (Lewis' Ed.) star p. 387, and note 37. The inference from Blackstone's text at this page is that, if the jury under the old practice did not inquire of the lands and chattels, the forfeiture did not take place, as he says:

"But the jury very seldom find the flight, forfeiture being looked upon, since the vast increase of personal property of late years, as too large. a penalty for an offense to which a man is prompted by the natural love of liberty."

It seems, however, from the cases referred to by Sir Matthew Hale, *supra*, and also *In re Bateman's Trust*, 15 L. R. Eq. Cas. 355, and *In re Tyson*, 1 Jur. 281, that it was customary for suit to be brought by officers of the crown for the purpose of reaching property forfeited as a result of a conviction, and subjecting it to the forfeiture.

This review of the history of forfeitures, when considered in connection with the history of the doctrine of former jeopardy and that they both grew up and existed side by side for centuries, presents two persuasive reasons supporting the act under consideration. The first is that, notwithstanding the doctrine of former jeopardy, for centuries a convict of felony forfeited all his property, real and personal. The second is that, wherever it was necessary to perfect the forfeiture, a civil action was brought to recover the property. If another and separate proceeding could always be brought to collect the penalty which then followed as an incident of the conviction—and if this additional action bore no relation to the doctrine of former jeopardy —the defendant complains that he is again in jeopardy because he is here given another chance to defend his property rights.

We turn now to an examination of the American cases. There are hundreds dealing with applications of this doctrine which do not concern us, and we therefore lay on one side all of those cases touching upon the question as to when jeopardy attaches, when the discharge of the jury is jeopardy, when a new trial may be granted, and confine our attention in the main to those cases dealing with jeopardy as affecting the right to re-

cover a penalty, or to enforce a forfeiture, and we must confess that it is difficult to reconcile them all, or to ascertain a consistent principle. In *People v. Stevens,* 13 Wend. (N. Y.) 341, it is said:

"It is undoubtedly competent for the Legislature to subject any particular offense both to a penalty and a criminal prosecution; it is not punishing the same offense twice. They are but parts of one punishment; they both constitute the punishment which the law inflicts upon the offense. That they are enforced in different modes of proceeding, and at different times, does not affect the principle. It might as well be contended that a man was punished twice, when he was both fined and imprisoned, which he may be in most misdemeanors."

This is the doctrine of the New York courts. *Blatchley v. Moser,* 15 Wend. 215; *People v. Snyder,* 90 App. Div. 422, 86 N. Y. Supp. 415. This doctrine was followed by Judge Blatchford, when Circuit Judge of the Southern District of New York, in Leszynsky's case, 16 Blatchf. 9, Fed. Cas. No. 8,279, where he quotes the passage from *People v. Stevens, supra,* with approval. In that case, section 3218 of the Rev. St. (U. S. Comp. St. 1901, p. 2085), relating to the internal revenue, was under consideration. That section provides that any person who commits the offense against the internal revenue there specified shall pay a penalty, and also be fined and imprisoned; the penalty to be recovered in a suit by the government, and the fine and imprisonment to be inflicted in a criminal prosecution. It is to be observed that the section, for the purpose under consideration, is substantially identical with the Oklahoma statute. In upholding this statute, Judge Blatchford, referring to the subject of second jeopardy, at page 17, says:

"But, even though the spirit of this amendment be to prevent a second punishment, under judicial proceedings, for the same crime, so far as the common law gave that protection (*Ex parte Lange,* 18 Wall. 163, 170 [21 L. Ed. 872]), yet the relator will not produce a second punishment for the same offense, but will only complete, on conviction, the punishment intended by Congress."

We have grave doubt about the soundness of the reasoning in the New York cases, and in the Leszynsky case. They sus-

tain similar statutes, on the ground that the two proceedings do not inflict two punishments, but merely complete the one punishment for the offense. If this reasoning was sound, then the Legislature might provide for punishment by fine and punishment by imprisonment for the same offense, and for a separate prosecution for the fine, and another prosecution for the imprisonment. It is unquestionably true that two punishments may be inflicted for one crime. Both fine and imprisonment may be, and frequently are, imposed.. The historical review which we have given shows that punishment of the severest sort has always been administered in connection with forfeiture of all of one's property. The question is not, therefore, whether two punishments may be inflicted, but whether the suit to recover the penalty and the prosecution of the criminal offense conflict with the former jeopardy provision.

The conclusion is supported by better reasoning in *United States v. Three Copper Stills* (D. C.) 47 Fed. 495, construing sections 3281 and 3296 of the Rev. Stat. (U. S. Comp. St. 1901, pp. 2127, 2136), which provide for a criminal punishment and forfeiture of the property for violations of the internal revenue law there specified, and holding that a conviction under one section was not a bar to proceedings under other sections for the forfeiture of the property. At page 499 of 47 Fed., Judge Barr says:

"The constitution of the United States (amendment 5) declares that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb,' but this provision is not a limitation upon the kinds of punishment which may be inflicted for an offense. Hence there may be a fine, an imprisonment, and forfeiture for the same offense, if the law so provides. This provision of the Constitution does not in terms include such a proceeding as this one. It was intended by a constitutional provision to embody the common-law rule, but that rule did not embrace proceedings *in rem*, such as this one, when the thing was forfeited because of its status, use, or location. *The Palmyra,* 12 Wheat. 12 [6 L. Ed. 531]; *State v. Barrels of Liquor,* 47 N. H. 374; *Sanders v. State,* 2 Iowa, 230; Wap. Proc. in Rem, secs. 24, 25; *State v. Inness,* 53 Me. 536. There is no case known to

me which decides that this constitutional provision includes a proceeding *in rem,* which is a civil action, within its inhibition."

In *United States v. Olsen* (D. C.) 57 Fed. 579, the owner of a vessel was indicted for aiding and abetting the act of his master in bringing Chinese laborers into the United States in violation of statute. He pleaded in bar a judgment of forfeiture against his vessel on account of the act of the master, and this plea was held bad. The third paragraph of the syllabus is as follows:

"A judgment of forfeiture entered against a vessel under Act of July 5, 1884, c. 220, sec. 10, 23 St. at L. 117 [U. S. Comp. St. 1901, p. 1309], for an act of the master in bringing Chinese laborers from a foreign port and landing them in the United States, in violation of section 2 of the Act, cannot be pleaded by the owner of the vessel in bar to an indictment for aiding and abetting the act of the master, as forbidden in section 11 of the Act. *United States v. McKee,* 4 Dill. 128 [Fed. Cas. No. 15,688], *Coffey v. U. S.,* 6 Sup. Ct. 437, 116 U. S. 436 [29 L. Ed. 684], and *United States v. One Distillery* [D. C.] 43 Fed. 846, distinguished."

In *Sanders v. State,* 2 Iowa, 230 (Cole's Edition), the statute making it a criminal offense to keep liquors in the state, and forfeiting such liquors, was sustained, and it was held that the defendant's conviction for keeping liquors was not a bar to a proceeding to forfeit; also, that if the criminal punishment and the forfeiture could be administered in one proceeding, there was no reason why two proceedings should not be pursued. *Commonwealth v. Prall,* 146 Ky. 109, 142 S. W. 202; *Jones v. State,* 15 Ark. 261; *State v. Czarnikow,* 20 Ark. 160; *State v. Spear,* 6 Mo. 644.

As a penalty for cutting timber on the public lands of a state, in addition to criminal punishment, punitive damages, such as double or treble the value of the timber cut, may be imposed, without infringing the former jeopardy provision. *State v. Shevlin-Carpenter Co.,* 99 Minn. 158, 108 N. W. 935, 9 Ann. Cas. 634; *Id.,* 102 Minn. 470, 113 N. W. 634, 114 N. W. 738; *Id.,* 218 U. S. 57, 30 Sup. Ct. 663, 54 L. Ed. 930. A municipal corporation having authority to fix fire limits may provide for the summary abatement of buildings erected contrary to its ordinance,

and may also make such erection a criminal offense. *Micks v. Mason,* 145 Mich. 312, 108 N. W. 707, 11 L. R. A. (N. S.) 653, and note, 9 Ann. Cas. 291. An acquittal upon a criminal charge for violating the liquor law is not a bar to a civil action brought against the defendant by the state to enjoin the maintenance of a place where intoxicating liquors are unlawfully sold. *State v. Roach,* 83 Kan. 606, 112 Pac. 150, 31 L. R. A. (N. S.) 670, note, 21 Ann. Cas. 1182. Some of the courts hold that punitive damages will not be allowed at the suit of an individual for an act which is likewise a criminal offense. *Koerner v. Oberly,* 56 Ind. 284, 26 Am. Rep. 34; *Austin v. Wilson,* 4 Cush. (Mass.) 273, 50 Am. Dec. 766; *Fay v. Parker,* 53 N. H. 342, 16 Am. Rep. 270. But the weight of authority, it is conceded, is to the contrary. 2 Sutherland on Damages (3d Ed.) sec. 402; *Brown v. Swineford,* 44 Wis. 282, 28 Am. Rep. 582; *Hauser v. Griffith,* 102 Iowa, 215, 71 N. W. 223.

The cases of *United States v. McKee,* 4 Dill. 128, Fed. Cas. No. 15,688; *United States v. One Distillery* (D. C.) 43 Fed. 846; *Coffey v. United States,* 116 U. S. 436, 6 Sup. Ct. 437, 29 L. Ed. 684; *United States v. Chouteau,* 102 U. S. 603, 26 L. Ed. 246; and *United States v. Ulrici,* 102 U. S. 612, 26 L. Ed. 249, note—would seem to reach a different conclusion. In the McKee case, 4 Dill. 128, Fed. Cas. No. 15,688, Justice Miller and Judge Dillon held that in a suit to recover the penalty, under section 3296 of the Rev. Stat. (U. S. Comp. St. 1901, p. 2136), a plea of former conviction and pardon by the President was a bar, on the ground that "our laws forbid that he or any one else shall be twice punished for the same crime or misdemeanor," and in *United States v. One Distillery* (D. C.) 43 Fed. 846, it was held that a corporation, when sued for a forfeiture of property, might interpose as a defense the conviction of one of its officers on a criminal charge for the same offense growing out of a violation of the internal revenue laws. This case was taken to the Supreme Court of the United States and is reported under the same name, in 174 U. S. 149, 19 Sup. Ct. 624, 43 L. Ed. 929, where the court affirmed the decision upon a technical ground

of pleading, intimating that the ground of the decision in the lower court might be erroneous, saying:

"But if, independently of the particular question raised by the amended and supplemental answer, the judgment of the District Court dismissing the information was right upon any ground disclosed upon the record, the judgment of the Circuit Court affirming the judgment of the District Court should not be held to have been erroneous."

In the Coffey case, 116 U. S. 436, 6 Sup. Ct. 437, 29 L. Ed. 684, it was held that the government could not recover the penalty prescribed by the internal revenue statutes, where it had previously prosecuted the defendant for the criminal offense, and he had been acquitted. In that case the statutes imposed penalty, fine, and imprisonment, just as our statute here does, and a proceeding was instituted by the government to forfeit the brandy, machinery, and stills involved, and was therefore a proceeding affecting only property rights. Coffey's defense was that he had been prosecuted criminally and acquitted, and this defense was held good. In the opinion it is said:

"The proceedings to enforce the forfeiture against the *res* named must be a proceeding *in rem* and a civil action, while that to enforce the fine and imprisonment must be a criminal proceeding, as was held by this court in *The Palmyra,* 12 Wheat. 1, 14 [6 L. Ed. 531]. Yet where an issue raised, as to the existence of the act or fact denounced has been tried in a criminal proceeding instituted by the United States, and a judgment of acquittal has been rendered in favor of a particular person, that judgment is conclusive in favor of such person on the subsequent trial of a suit *in rem* by the United States, where, as against him, the existence of the same act or fact is the matter in issue as a cause for the forfeiture of the property prosecuted in such suit *in rem.* It is urged as a reason for not allowing such effect to the judgment that the acquittal in the criminal case may have taken place because of the rule requiring guilt to be proved beyond a reasonable doubt, and that, on the same evidence, on the question of preponderance of proof, there might be a verdict for the United States in the suit *in rem.* Nevertheless, the fact or act has been put in issue and determined against the United States; and all that is imposed by the statute, as a consequence of guilt, is a punishment therefor. There could be no new trial of the criminal prosecution after the acquittal in it; and a subsequent

trial of the civil suit amounts to substantially the same thing, with a difference only in the consequences following a judgment adverse to the claimant."

The Choteau case, 102 U. S. 603, 26 L. Ed. 246, was an action against the principal and sureties on the bond of a distiller, to recover penalties imposed by statute. The defense was that the distiller had been indicted and that the indictment had been compromised and settled by the payment of a fine. The court held that this was a good defense, on the ground that the sureties on the bond shall not be subjected to the penalties connected with the offense, after the principal has effected a full and complete compromise with the government, under the sanction of an act of Congress, of prosecutions based upon the same offense and designed to secure the same penalty. The Ulrici case, 102 U. S. 612, 26 L. Ed. 249, note, was the same as the Chouteau case, except that the defense was not a compromise, but that the defendant had pleaded guilty and had been fined and imprisoned. It was held that this verdict prevented recovery of the penalties on the bond.

It will be observed that in the Coffey case the verdict was "not guilty." In the Chouteau case the verdict was a compromise, while in the Ulrici case the verdict was "guilty," and that the court held in each case that the verdict barred the prosecution of the action for the penalty. We confess that these cases seem to us strongly to support the position of the defendant, and yet the fact remains that the sections of the internal revenue laws which are construed in those cases are still the law, and are still in force, and that the court has never held those statutes to be unconstitutional, but has merely held that the criminal prosecution bars the civil remedy. As we have previously held, it seems to us that the statute must stand or fall as a whole, as the penalty is plainly cumulative upon the criminal punishment, and as any proceeding must be based upon the statute.

It is worthy of note and entitled to weight that there has been a series of legislation by Congress very similar to the act here under consideration. The provisions of the internal revenue laws imposing a penalty or a forfeiture and fine and imprison-

ment for the same offense illustrate the trend of congressional
legislation.   These various sections of the internal revenue laws
have been previously cited and are referred to in the Leszynsky
case, 16 Blatchf. 9, Fed. Cas. No. 8,279, in the Coffey case, 116
U. S. 436, 6 Sup. Ct. 437, 29 L. Ed. 684, and in other cases herein
cited.   The act with reference to Chinese laborers (23 St. at L.
117) passed in 1884, punishes a violation by fine or imprisonment
and forfeiture of the vessel.   *United States v. Olsen* (D. C.)
57 Fed. 579.   By the Act of June 10, 1890, known as the Cus-
toms Administrative Act, forfeiture of the merchandise or the
value thereof is provided, and also fine and imprisonment:   Act
June 10, 1890, c. 407, 26 St. at L. 131 (U. S. Comp. St. 1901,
p. 1886); *United States v. Zucker*, 161 U. S. 475, 16 Sup. Ct.
641, 40 L. Ed. 777.   The fact that these various statutes have
been in force for many years is persuasive of their validity.

It is also a fundamental principle of constitutional law that
the courts will not declare an act of the Legislature unconstitu-
tional, unless it is clear that such is the case.   Upon the whole,
we are inclined to the view that this act of the Legislature is not
in conflict with the former jeopardy provision of the Constitu-
tion, although some doubt is thrown upon this conclusion by the
cases of McKee, Coffey, Chouteau, and Ulrici, cited *supra*.   In
view of our reluctance to strike down an act of a co-ordinate de-
partment of the government, we resolve the doubt in favor of the
law, and hold that the act is not subject to the attack here made
upon it.

Fourth.   It is finally urged that this act is invalid, because
it is repugnant to the prohibitory provision of the Constitution,
in that it increases the punishment for the sale of liquor.   This
objection is not well taken.   The section under review is impos-
ing a penalty for using or permitting one's building to be used
in violation of the prohibitory law, and it is a well-settled rule
that the same act may be made separate offenses where the evi-
dence supporting the two offenses must be different.   In this
case, if the defendant had been indicted for selling liquor, the
question of the ownership of the building would be immaterial,
while in this proceeding the question of the ownership of the

building is fundamental. *Gavieres v. United States,* 220 U. S. 338, 31 Sup. Ct. 421, 55 L. Ed. 489; *State v. Innes,* 53 Me. 536; *State v. White,* 123 Iowa, 425, 98 N. W. 1027; Wharton's Criminal Law, p. 344.

The judgment of the trial court should be affirmed.

By the Court: It is so ordered.