## DEWEY RICKETTS v. STATE.

No. A-3825.    Opinion Filed April 28, 1923.

(215 Pac. 212.)

(Syllabus.)

1.    Larceny—Evidence Sufficient to Sustain Conviction for Grand Larceny. In a prosecution for grand larceny, evidence held to support a conviction.

2. **Evidence—Forcibly Taking Shoes from Accused under Arrest to Compare with Footprints not Compelling Evidence Against Himself.** Forcibly taking shoes from a defendant under arrest for purposes of comparison of footprints does not violate his constitutional right not to be compelled to give evidence against himself.

3. **Same—Evidence not Inadmissible as Unreasonable Search and Seizure.** The constitutional provision against unreasonable searches and seizures does not prevent the introduction of evidence of a comparison of footprints with shoes forcibly taken from one accused of crime.

Appeal from District Court, Comanche County; Cham Jones, Judge.

Dewey Ricketts was convicted of grand larceny, and he appeals. Affirmed.

J. F. Thomas, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. Plaintiff in error, Dewey Ricketts, was convicted of larceny, and, in accordance with the verdict, was sentenced to imprisonment in the penitentiary for one year. From the judgment in the case he prosecutes this appeal. The errors assigned and relied on for a reversal of the judgment are based on rulings of the court in the admission of testimony for the state against defendant's objections.

It appears from the record that plaintiff in error and two others were jointly charged in the information with the theft of seven automobile casings of the value of $150; that the same were stolen from the place of business of Otto Hess, in the town of Indiahoma; that the defendants were seen the evening before in the city of Lawton in an automobile, which the evidence shows was driven from Lawton to Indiahoma and back to Lawton that night. Foot tracks were found near the place where the theft was committed. Plaintiff in error, then

under arrest, and in the custody of the sheriff, was compelled to take off the shoes worn by him, the shoes were taken to the place where the theft was committed, and fitted into the tracks there found.

J. D. Poole, deputy sheriff, testified:

"The tracks were plain, and I turned a box over on the tracks and told them not to move the box. I told defendant, Dewey Ricketts, to take his shoes off, and he refused to do so. I think he took them off when the sheriff asked him to take them off. I took the shoes, and compared them with the tracks. One heel made a more distinct track than the other, and this shoe fitted it exactly. The same tracks were made at the garage. I also found tracks in the smooth place north of Hess's garage that were identical."

Carl Froenberger, sheriff, testified:

"I told defendant, Dewey Ricketts, that I wanted his shoes to compare with the tracks out there; that we would have to take the shoes or he could go along, either one. He was under arrest and we were in my office at the time."

The defendant objected to all this evidence, "because it shows that defendant was forced, while under arrest, to furnish evidence against himself in violation of his rights under the federal and state Constitutions, which provide that no person shall be compelled to furnish evidence against himself." Objection overruled, and exceptions allowed.

The defense interposed was an alibi.

Defendant as a witness in his own behalf testified:

"I was arrested about 3 o'clock in the afternoon. About 10 minutes later they wanted my shoes; said they wanted to go to Indiahoma. I refused. Then the sheriff said I would have to take them off. I took them off because it was two against one. I had just traded for the shoes the day before

in Oklahoma City. If they fitted those tracks I know nothing about how it happened."

It is contended that the court erred in admitting the testimony of the witnesses as to the result of fitting the defendant's shoes with the tracks found near the place where the theft was committed, in that the action of the sheriff in compelling the defendant to take off his shoes was in violation of the constitutional provision that "no person shall be compelled to give evidence which will tend to incriminate him" (Const. art. 2, § 21), and also of the constitutional provision that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated" (Const. art. 2, § 30)—citing State v. Sirmay, 40 Utah, 525, 122 Pac. 748, and Davis v. State, 131 Ala. 10, 31 South. 569.

In the Sirmay Case it is held:

"While an accused cannot be compelled to give evidence against himself by submitting to a comparison of his foot with prints found at the place of the commission of a crime, if at the solicitation of a sheriff, he voluntarily places his foot in the tracks left by the criminal or surrenders his shoes to the sheriff for such comparison, he cannot object to testimony as to the comparison."

In the Davis Case it is held:

"Evidence that defendant declined to consent to the taking away of the shoes which he was wearing for the, purpose of comparing them with tracks supposed to have been made by him is inadmissible under the constitutional guaranty of immunity from being compelled to incriminate himself."

After careful investigation we have reached the conclusion that the evidence in question was properly admitted. The history of the constitutional provision referred to clearly de-

monstrates that it was not intended to reach a case like this. Story's Constitutional Limitations, § 1788.

The constitutional provision guarantees no greater privilege than that all persons, whether parties or extraneous witnesses, shall be free from compulsion by legal process, to give self-incriminating testimony. The principal purpose of the provision was to prohibit compulsory examination of prisoners before trial or upon trial, for the purpose of extorting unwilling confessions or declarations implicating them in crime. It could reach further only in exceptional and peculiar cases coming within the purpose and spirit of the inhibition.

In People v. Van Wormer, 175 N. Y. 188, 67 N. E. 299, the Court of Appeals of New York held that:

"Const. art. 1, § 6, providing that no one can be compelled to be a witness against himself in a criminal prosecution, is not violated, where the shoes of defendants on trial for murder were taken from them, and placed in the footmarks leading to the house of deceased, made in newly fallen snow on the night of the murder, by the admission of evidence of the fact on the trial."

In Magee v. State, 92 Miss. 865, 46 South. 529, the defendant was charged with assault with intent to kill and murder, and was compelled to put his foot in the track found near the place where the crime was alleged to have been committed, for the purpose of identifying him. The Supreme Court of Mississippi held that this evidence was not objectionable as compelling him to be a witness against himself in violation of the Fifth Amendment to the federal Constitution, and as compelling him to give evidence against himself in violation of the provision of the Constitution of Mississippi, providing that "a defendant shall not be compelled to give evidence against himself." In the opinion it is said:

"There has been great confusion in some courts on this subject; but we do not see how it is possible, logically, to sustain an objection to compelling the defendant simply to put his foot in a track for the purpose of identification on the ground that he was privileged by the constitutional provisions referred to against being compelled to testify or to give evidence against himself. He is not, in such cases, giving evidence. He is not testifying as a witness. He is not delivering any testimonial utterance."

In State v. Graham, 74 N. C. 646, 21 Am. Rep. 493, the defendant was charged with larceny. Footprints were discovered at the scene of the crime, and leading to and from it to a fence in the direction of the defendant's house. The officer who made the arrest compelled the prisoner to put his foot in the tracks, thus demonstrating an exact correspondence. This was proved upon the trial, over defendant's objection. On review the court held the evidence admissible on the theory that, though the act of the officer was an invasion of defendant's right, yet it did not affect the resemblance, the only fact which had weight as evidence. In the opinion the court said:

"The object of all evidence is to elicit the truth. Confessions which are not voluntary, but are made either under th' fear of punishment if they are not made, or in the hope of escaping punishment if they are made, are not received as evidence, because experience shows that they are liable to be influenced by those motives, and cannot be relied on as guides to the truth. But this objection will not apply to evidence of the sort before us. No fears or hopes of the prisoner could procure the resemblance of his track to that found in the cornfield. This resemblance was a fact calculated to aid the jury and fit for their consideration. Evidence of this sort called by the civilians 'real evidence,' is always admissible and is of greater or less value according to the circumstances."

Prof. Wigmore says:

"Looking back at the history of the privilege (ante, §
2250) and the spirit of the struggle by which its establishment
came about, the object of the protection seems plain.  It is
the employment of legal process to extract from the person's
own lips an admission of his guilt, which will thus take the
place of other evidence.  Such was the process of the ecclesias-
tical court, as opposed through two centuries—the inquisitor-
ial method of putting the accused upon his oath, in order to
supply the lack of the required two witnesses.  Such was the
complaint of Lilburn and his fellow objectors, that he ought
to be convicted by other evidence, and not by his own forced
confession upon oath.  Such, too, is the inference from the
policy of the privilege as a defensible institution (ante, §
2251); that is to say, it exists mainly in order to stimulate the
prosecution to a full and fair search for evidence procurable
by their own exertions, and to deter them from a lazy and
pernicious reliance upon the accused's confessions.  Such,
finally, is the practical requirement that follows from the ne-
cessity of recognizing other unquestioned methods of procur-
ing evidence; for if the privilege extended beyond these limits,
and protected an accused otherwise than in his strictly testi-
nominal status—if, in other words, it created inviolability not
only for his physical control of his own vocal utterances, but
also for his physical control in whatever form exercised, then
it would be possible for a guilty person to shut himself up
in his house, with all the tools and indicia of his crime, and
defy the authority of the law to employ in evidence any-
thing that might be obtained by forcibly overthrowing his
possession and compelling the surrender of the evidential
articles—a clear reductio ad absurdum.  In other words, it
is not merely compulsion that is the kernel of the privilege,
in history and in the constitutional definitions, but testi-
monial compulsion.   The one idea is as essential as the other.
The general principle, therefore, in regard to the form of the
protected disclosure, may be said to be this:   The privilege
protects a person from any disclosure sought by legal process

against him as a witness.'' Section 2263, p. 3123, Wigmore on Ev.

"Bodily Exhibition. If an accused person were to refuse to be removed from the jail to the courtroom for trial, claiming that he was privileged not to expose his features to the witnesses for identification, it is not difficult to conceive the judicial reception which would be given to such a claim. And yet no less a claim is the logical consequence of the argument that has been frequently offered and occasionally sanctioned in applying the privilege to proof to the bodily features of the accused. The limit of the privilege is a plain one. From the general principle (ante, § 2263) it results that an inspection of the bodily features by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, i. e., upon his testimonial responsibility. That he may in such cases be required sometimes to exercise muscular action—as when he is required to take off his shoes or roll up his sleeve—is immaterial, unless all bodily action were synonymous with testimonial utterance; for, as already observed (ante, § 2263), not compulsion alone is the competent idea of the privilege, but testimonial compulsion. What is obtained from the accused by such action is not testimony about his body, but his body itself. Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one. Both principle and practical good sense forbid any large interpretation of the privilege in this application; and healthy judicial opinion has frequently pointed this out with force.'' Section 2265, p. 3828, Wigmore on Ev.

In Morris v. State, 124 Ala. 44, 27 South. 336, it is held that it was competent for the state to show that the shoes taken from the defendant's house, and belonging to him, were compared with tracks found near the scene of the crime, and were the same in length and breadth.

The case of Myers v. State, 97 Ga. 76, 25 S. E. 252, is directly in point. The officer in charge of the prisoner ordered the prisoner's shoes to be taken from him for the purpose of comparing them with tracks found near the place where the body of the murdered man was discovered. The trial court excluded the evidence of the officer as to the result of the comparison, but failed to admonish the jury not to consider it. On review it was held that the omission to admonish was not prejudicial because the evidence was competent and should have been admitted; and the court remarked that —

"It was the duty of the officer to have taken from the possession of the defendant any article which he might have had that would throw any light upon the circumstances of his guilt or innocence, and preserve it for use at the trial."

In the case of State v. Fuller, 34 Mont. 12, 85 Pac. 369, 8 L. R. A. (N. S.) 762, 9 Ann. Cas. 648, it is held that forcibly taking shoes from an accused person for the purpose of comparison with footprints does not violate his constitutional right not to be compelled to give evidence against himself, and that the constitutional provision against unreasonable searches and seizures does not prevent the introduction of evidence of a comparison of footprints with shoes forcibly taken from one accused of crime.

We are of opinion that the rule stated is supported by better reasons as well as by the weight of authority. Upon a consideration of the whole case we are satisfied that the substantial rights of the defendant have not been prejudiced by reason of any error of law appearing in the record. The judgment of the trial court is accordingly affirmed.

MATSON, P. J., and BESSEY, J., concur.