## A. B. C. DAVIS v. STATE.

No. A-4828.    Opinion Filed Feb. 4, 1925.
Rehearing Denied April 11, 1925.
(234 Pac. 787.)

(Syllabus.)

1. Searches and Seizures—Seizure of Incriminating Articles in Possession of One Lawfully Arrested. The immunity guaranteed by the provisions of the Bill of Rights (Const. art. 2, § 30) against unreasonable searches and seizures does not extend to the tools, implements, and papers found on the person or in the possession of the person lawfully placed under arrest, where such tools, implements, or papers have been, or manifestly may be, used to perpetrate the crime charged.

2. Same—Seizures Under Warrant for Arrest, and Under "Search Warrant," Distinguished. There is a well-defined distinction between the right to seize contraband goods and papers under authority of a warrant of arrest and under authority of a search warrant. Under a warrant of arrest a seizure may follow as an incident to the arrest; a "search warrant" is a kind of writ of discovery, and the arrest of the offender, if any, follows the discovery as an incident ancillary to it.

3. Evidence—Articles Taken from Person Lawfully Arrested Admissible. Where the instrumentalities for committing the crime are taken from the person or possession of the person lawfully arrested, their introduction in evidence is ordinarily not objectionable as being in violation of the provision of the Bill of Rights (Const. art. 2, § 21) against requiring the accused to give testimony against himself.

4. Searches and Seizures—Seizure Without Search Warrant of Cumbersome Articles in Possession of One Lawfully Arrested. Where the tools and instruments found in the possession of the person lawfully arrested are numerous or cumbersome, so

that the officer making the arrest cannot at the time of the arrest take them with him, he may convey the prisoner to a place of safety and return to the place of arrest and seize the things found in the possession of the person arrested, without a search warrant.

5. **Evidence—Evidence of Other Offenses Admissible to Identify Accused, to Show System, Motive, or Intent.** An exception to the rule of evidence that evidence of other offenses cannot be introduced to establish the commission of the offense charged arises where the other offense or offenses tend to identify the accused with the offense charged; or where such testimony is for the purpose of showing that the offense charged was a part of a system or common scheme or plan, including other like offenses; or where proof of a separate offense is explanatory of the motive or intent of the offender in the commission of the crime charged.

6. **Evidence—Excluding Testimony of Doubtful Value not Error.** Where the relevancy and probative force of proffered testimony is vague, remote, and of doubtful value, its exclusion is not error.

7. **Evidence—Witnesses not Accomplices in Abortion Charged Need not Be Corroborated.** Rule that the testimony of accomplices must be corroborated not applicable.

Appeal from District Court, Oklahoma County; A. S. Wells, Special Judge.

A. B. C. Davis was convicted of murder, and he appeals. Affirmed.

John R. Guyer, C. D. Peck, and Victor A. Sniggs, for plaintiff in error.

The Attorney General and Baxter Taylor, Asst. Atty. Gen., for the State.

BESSEY, P. J. On April 1, 1923, a physician, A. B. C. Davis, plaintiff in error, herein referred to as the defendant, was in the district court of Oklahoma county, by a verdict of a jury, found guilty of the murder of Mary Sudik, accomplished by the use and employment of instruments upon her for the purpose of

producing a criminal abortion. The punishment imposed by the jury was imprisonment for life. This appeal is from the judgment on the verdict, after the overruling of a motion for a new trial.

The evidence on the part of the state indicates that the defendant maintained an office, operating rooms, and rooms with beds for patients at 115½ West Grand avenue, Oklahoma City; that Mary Sudik and her husband, Ernest Sudik, lived some miles southeast of Oklahoma City, on a truck farm; that early in February, 1923, Mary Sudik ascertained that she was pregnant, and that she and her husband thereupon endeavored to find some one who would perform an operation upon her to bring on a miscarriage; that after making some inquiries they were directed to go to the office of the defendant. On February 10th they accordingly went to defendant's office and told him of Mrs. Sudik's pregnancy and that she wished to be relieved from that condition. The defendant told them that he could do that kind of work; that it would not be dangerous; and they then entered into an agreement for the operation and the compensation to be paid therefor. After the necessary preparation, the patient was placed upon the operating table and the operation performed, by means of certain instruments, culminating in an abortion. At the time of the operation, or in consequence of it, the patient became infected with blood poison which resulted fatally. Later the husband of the deceased woman returned to the office of the defendant and apprised him of the fatal result of the operation. The defendant said he was sorry and offered the husband money, as he said, to help defray the expenses of the funeral. The husband did not take any money at this time, but later complained to the county attorney of defendant's treatment of his wife and her death. The county attorney

advised him to return to the office of the defendant and take any money which he might offer him, and this was accordingly done. Upon this second visit defendant gave to Mr. Sudik the sum of $50, but before paying it induced the husband to sign the following written statement:

"Oklahoma City, Okla., Feb. 20, 1923.

"This will exonerate Dr. A. B. C. Davis from any blame concerning the illness or death of my wife, Mary Sudik, on February 12, 1923, near Moore, Oklahoma.
                                              "Ernest Sudik.
"Witness     Gus Sudik."

Mr. Sudik then, according to a prearranged plan, returned to the county attorney's office and turned over to the county attorney the money which Dr. Davis had given him, whereupon a warrant of arrest was issued for the defendant. A deputy sheriff went to the defendant's office, placed him under arrest, and conveyed him to jail. At the time of the arrest the officer seized a large quantity of ergot and other drugs commonly used to bring about miscarriages. Immediately after placing the defendant in jail, the officers returned to defendant's office and seized and carried away some instruments and appliances commonly used to perform abortions. The officers at this time also seized and carried away a number of written statements signed by divers women, the purport of which was that the persons signing these papers agreed to hold the defendant blameless for any dangerous or fatal results that might follow his treatment of them, and in all of which, by words or inference, it was indicated that the anticipated danger was caused by self-inflicted treatment or by operations performed by others. Many of the persons who had signed these statements were later found by the county attorney and

subpoenaed as witnesses for the state. They all testified that the defendant had performed operations upon them under circumstances indicating that his practice consisted chiefly in performing abortions. One of these witnesses was convalescing from such an operation in one of the beds in the room adjoining the doctor's office at the time of his arrest; another one came there for an operation while the premises were in charge of the officers and were being searched by them, following the arrest. These several operations performed upon other women, as shown by the witnesses who testified at the trial. were performed at various times within the three or four months immediately preceding the time of the defendant's arrest.

The defendant admitted that he had administered medical and surgical treatment to different women patients, but claimed that he did not commit nor attempt abortions upon any of them. Concerning treatment given to these women, as shown by the statements exonerating him from serious or fatal results, the defendant claimed that these women all came to him after having attempted abortions upon themselves or after some other person had attempted to perform such operations upon them; and that the treatment the defendant administered was only such as seemed necessary under all the conditions apparent. Defendant claimed that this was the case with the deceased, and that he did no more than administer to her such treatment as the case seemed to warrant.

The numerous assignments of error urged in this appeal may be grouped thus:

(1) That the instruments, medicines, and documents seized and taken from the office of the defendant were inadmissible as evidence because they were ob-

taind by illegal and unreasonable search and seizure; that using them as evidence was compelling the defendant to give evidence against himself.

(2)   That the evidence of the several other abortions performed upon other women by the defendant near the time of the particular offense here charged was inadmissible.

(3)   That the evidence of Mrs. Kinney, from which the jury might have drawn an inference that Mary Sudik may have procured the abortion elsewhere, or may have performed it herself, was improperly withdrawn from the jury.

(4)   That there was no sufficient corroboration of the testimony of the several women who were self-confessed accomplices with the defendant in separate offenses.

(5)   Misconduct of the county attorney.

The immunity guaranteed by the provisions of the Bill of Rights (Const. art. 2, § 30) against unreasonable searches and seizures does not extend to the tools, implements, and papers found on the person or in the possession of the person lawfully placed under arrest, where such tools, implements, or papers have been or manifestly may be used to perpetrate the crime charged. This provision was designed to protect persons from unwarranted invasions of the privacy of their persons and effects on mere suspicion without probable cause; but where one is legally arrested for a crime, upon authority of a valid warrant for his arrest, the warrant of arrest itself implies probable cause. Under such circumstances, it is not incumbent upon the officer who makes the arrest to procure a search warrant in order to search for the means or instruments of commit-

ting the crime, found in the possession of the person arrested.

There is a well-defined distinction between the right to seize contraband goods and papers under authority of a warrant of arrest and under authority of a search warrant. Under a warrant of arrest a seizure may follow the arrest as a proper incident to it; a "search warrant" is a kind of writ of discovery and the arrest of the offender, if any, follows the discovery as an incident ancillary to it. People v. Chiagles, 237 N. Y. 193, 142 N. E. 583, 32 A. L. R. 676, notes and annotations.

Nor is the introduction in evidence of the things so seized compelling the accused to give evidence against himself, within the purview of the Constitution (article 2, § 21). Berg v. State, 29 Okla. Cr. 112 233 P. 497; Ricketts v. State, 23 Okla. Cr. 267, 215 P. 212; Browne v. U. S. (C. C. A.) 290 F. 870; Weeks v. U. S., 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 177; 2 R. C. L. 468.

The provisions of the Bill of Rights relating to unauthorized searches and seizures will not operate to make sacred the possession of bludgeons, knives, pistols, etc., found in the actual present possession of a person arrested for a violent crime, nor is there anything sacred about forged instruments, counterfeit bills, or notes found in the possession of one arrested for forgery or false pretense. Getchell v. Page, 103 Me. 387, 69 A. 624, 18 L. R. A. (N. S.) 253, notes and annotations, 128 Am. St. Rep. 307; Baron v. U. S. (C. C. A.) 286 F. 822; People v. Chiagles, supra.

Where the tools and instruments found in the possession of the person lawfully arrested are numerous. or cumbersome, so that the arresting officer cannot at

the time of the arrest take them with him, we see no reason why he may not convey the prisoner to a place of safety and return to the place of arrest and seize the things found in the possession of the person arrested, without a search warrant, as was done in this case. Suppose an officer, upon authority of a valid warrant, arrested one for operating a whisky still, and while making the arrest found the person arrested in possession of boilers, worm, condensers, and barrels containing mash in process of fermentation. These would be too cumbersome to carry away with the prisoner; reason would indicate that the officer might take the prisoner to jail, or other place of safety, and return and take possession of the apparatus and materials used, or to be used, in violating the law for which the offender was arrested; and these things might later be introduced in evidence against the person arrested.

In this case the medicines, instruments, and written documents explanatory of their use, taken from the defendant, were introduced in evidence, but later withdrawn from the consideration of the jury, upon the theory that the evidence was inadmissible because it had been procured illegally. The defendant complains that its exclusion near the end of the trial did not cure the error. But holding as we do that this evidence was competent, its subsequent withdrawal was to the advantage of the defendant.

The defendant objected to the introduction of evidence tending to show that the defendant had a short time prior to the commission of the offense charged committed other abortions upon other women under like circumstances.

An exception to the rule of evidence that evidence of other offenses cannot be introduced to establish the commission of the offense charged arises where the

other offense or offenses tend to identify the accused with the offense charged; where such testimony is for the purpose of showing that the offense charged was a part of a system or common scheme or plan, including other like offenses; or where proof of a separate offense is explanatory of the motives of the offender in the commission of the offense charged.

The several women who had signed statements exonerating the defendant were brought into court and unwillingly testified that the defendant had performed abortions for them and that the portions of the several written statements implying that they or some other person had first attempted to perform criminal operations upon them were false, under circumstances indicating that these false statements were signed and agreed to as conditions precedent to the performing of the operations by the defendant. The evidence of all these women indicated that the defendant was an habitual criminal abortionist and that these statements were so framed by him for his own self-protection, showing a similarity of method and intent in each case.

In the case of Barnett v. State, 104 Ohio St. 298, 135 N. E. 647, 27 A. L. R. 351, the court held:

"In a trial upon an indictment charging sodomy with a little girl six years of age, evidence of other like assaults upon other little girls, at or near the time charged in the indictment, is admissible to prove the habitual moral degeneracy and sexual perversion of the person committing such offenses and his criminal course of lascivious conduct, all for the purpose of identifying the defendant as the sexual pervert who committed the crime charged in the indictment."

In the case of State of Kansas v. King, 111 Kan. 140, 206 P. 883, 22 A. L. R. 1006, it was held that where the dominant facts pertaining to three homicides were

so similar in character, in apparent motive, in common purpose, and in obvious results, showing that the victim disappeared and was never afterwards seen alive, and that the accused had possession in each case of the victim's property and intimate personal effects, and that the remains in each instance were found upon the premises occupied by the accused, all tending to show that the victims must all have died through violence by a common hand, the facts pertaining to these homicides, whether committed before or after the one for which the accused was on trial, were admissible for the purpose of ascertaining the identity of the slayer in the case on trial.

In the case of Lyman v. State, 136 Md. 40, 109 A. 548, 9 A. L. R. 401, it was held that in a prosecution for false pretense in obtaining property by means of a worthless check, evidence is admissible of the giving of similar checks by the accused to other persons at and about the time of the offense charged, as tending to show intent to defraud and a scheme to obtain goods wherever and from whomsoever possible. This principle of the law of evidence is copiously annotated in the volumes of A. L. R. cited, covering cases of burglary, homicide, larceny, robbery, and other offenses. And this rule has been adhered to in our own state. In the case of Winston v. State, 16 Okla. Cr. 648, 185 P. 832, it was held that where the defendant, a cashier of a railway company, was charged with the embezzlement of a specific sum of money on a certain day, evidence tending to show that he on numerous other occasions a short time previous thereto took other money from the railway company, which had come into his hands as cashier, was properly admitted, as indicating a system and regularity of embezzlements by the defendant from day to day, and as also tending to connect the defendant with the commission of the of-

fense charged. Littrell v. State, 21 Okla. Cr. 466, 208 P. 1048; Vickers v. United States, 1 Okla. Cr. 452, 98 P. 467; Hunter v. State, 3 Okla. Cr. 533, 107 P. 444; Miller v. State, 9 Okla. Cr. 255, 131 P. 717, L. R. A. 1915A, 1088.

The defendant complains that the testimony of Rebecca Kinney was improperly withdrawn from the jury. Mrs. Kinney stated that she lived at Snyder; that her husband was a farmer and she was a midwife; that she came to Oklahoma City frequently; that she was in Oklahoma City in February to consult with Dr. Smith; that she saw and talked to a woman in a building east of the White Swan Laundry, in the north part of town (Oklahoma City) on February 8, 1923, and that this woman said her name was Sudik; that she was a little, dark woman who looked like a foreigner; that she was wearing a dark suit and a small hat of some kind; that she did not remember the color of her eyes or her hair, but her eyes were bloodshot. In the absence of the jury, this woman was examined at length, in the course of which examination she said:

"She came into the room, and she says, 'Will you do something for me? I am just dying.' I said, 'Child, what is the matter with you?' Her face was red, and I said, 'What makes your face so red?' and she said, 'I have taken stuff and would rather die than have another child and bring it into the world to starve like we do,' and I said, 'What did you take?' and she said, 'Two boxes of Chichester pills and a quart of turpentine'; that it had brought her sickness on, and she showed me, and I told her to take lithia tablets and lots of water and go to bed, and I asked her if she had any one to take care of her, and she said she had her husband, and I told her to have him put her to bed and put lots of bedclothes on her and that would relieve her."

At the close of the examination of this witness,

the attorney for the state objected to her testimony because the witness did not know the deceased and her identification was insufficient; that the proffered testimony was incompetent and not explanatory of the incidents that occurred in the defendant's office on February 10th. The objection was sustained, and the evidence of this witness was not permitted to go to the jury.

An examination of the 19 or 20 pages of this witness' statements indicates that her testimony scarcely rises to the dignity of evidence. Its relevancy and probative force are so vague, uncertain, and remote that, if false, it would not support a charge of perjury.

There was no abuse of discretion of the trial court in refusing to let it go to the jury, and his ruling in so excluding it, under the circumstances, will not be disturbed. 10 R. C. L. "Evidence," §§ 87, 88.

The defendant further complains that the testimony of the several women who said that the defendant had performed criminal abortions for them was that of accomplices in crime, and that their testimony must be corroborated by other evidence. These women were not accomplices in the particular crime for which the defendant was on trial, and some of the impelling reasons for the rule that the testimony of an accomplice in the crime charged must be corroborated are wanting. No authorities are cited in support of defendant's claim in this regard, and we have been unable to find any case in which it has been held that corroboration of a witness who was an accomplice with the accused in some other crime is necessary.

The misconduct of the county attorney, such as it was, was cured by the admonitions of the court.

The record shows that this defendant was a pro-

fessional criminal abortionist, of the most reprehensible type. The offense in this case was aggravated by the fact that after the operation was performed he took no pains to avoid or prevent serious or fatal consequences.

The judgment of the trial court is affirmed.

DOYLE and EDWARDS, JJ., concur.