# RICHARD E. THACKER v. STATE.

No. A-8574.   Oct. 27, 1933.
Rehearing Denied Nov. 17, 1933.
(26 Pac. [2d] 770.)

Ben F. Williams, Ben C. Arnold, T. R. Benedun, and Homer Cowan, for plaintiff in error

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter referred to as the defendant, was convicted of murder, and

his punishment fixed at imprisonment in the state penitentiary for life.

The evidence on the part of the state, in substance, shows that the defendant maintained an office and operating rooms in the Terminal building, Oklahoma City. In the early part of April, 1932, Ruth Hall, a single and unmarried woman, discovered she was pregnant, and in company with Helen Wright, a girl friend, went to the office of defendant; Helen Wright states that apparently, at the time they went to the office of defendant, Ruth Hall was in good physical condition; she had seen her frequently for several months prior to the day they went to defendant's office; at the time she went to defendant's office Ruth Hall was on her vacation, and the purpose of this visit was to see the defendant and to make arrangements to go back to the defendant's office, and he told Ruth to come back at noon the next day—

"I went with Miss Hall to defendant's office Wednesday noon; before we went to defendant's office Miss Hall made arrangements to borrow some money; Margy Brown also accompanied Miss Hall and myself to the office; Miss Hall and I went into the private office where there was an operating table; Miss Hall paid defendant some money, the exact amount I do not know, and then got on the operating table at defendant's request. She was on her back with her knees up; defendant used a long slender instrument, and then packed her with gauze; I guess he packed her womb; I saw him insert the instrument into her private parts; he did not make any examination before he used this instrument, nor did he take her temperature; he did not test her heart or feel her pulse. If he asked anything about her condition I did not hear it; we were in a small narrow room; she asked him when to remove the gauze, and he said 24 hours.

"When we left there were some other women in the office. Miss Brown left with us; we later went home with Miss Hall and I staid four hours with her; I saw her again Thursday at 607 West Tenth street; Miss Benne and I slept in the room with Miss Hall that night; that night she became ill and I think something happened; she got up and went to the bathroom, and later on there was quite a bit of blood on the bed; I left Miss Hall's room about 10 o'clock the next morning. I never saw her after that."

Elma Benne stated:

"Ruth Hall roomed with me during the month of April, 1932; I lived at 607 West Tenth street; she was employed at the telephone office; I think she was about 22 years of age; I came to the city Wednesday morning prior to the death of Miss Hall with Margy Brown, Helen Wright, and Ruth Hall; I saw Ruth that evening when she came home; I understood Wednesday morning she was pregnant; Helen Wright spent Thursday night with Miss Hall; she came there about 6 or 7 o'clock in the evening; I examined the bed after Miss Hall left where we were living and there was blood on the bed; a spot the size of two hands; Friday morning a form passed; prior to this form passing Ruth suffered quite a bit, afterwards she seemed to feel a little better; up until the 4th or 5th of April, 1932, Ruth Hall was in good condition; she was working all the time; she had been on her vacation two days prior to the Wednesday of which I have spoken; during the time Miss Hall was sick at our room there was no doctor called or visited her; her brother came for her and took her to her father and mother's home."

Margy Brown on behalf of the state testified she lived at 118 East Ninth street, Oklahoma City, Okla.; she was 19 years of age, single and unmarried; she knew Ruth Hall about a year and a half prior to her death—

"I was not rooming with her in April, 1932; I went with Ruth Hall to defendant's office on or about the 5th of April, 1932; her physical condition was good; I only

went into the reception room; defendant was not in when we got there; we sat down and waited until he came in; defendant called Miss Hall into the private room and they were there about five or ten minutes; Ruth said she was pregnant at that time; I do not know what happened in the office except what Miss Hall told me; when they came out of the private room Mrs. Thacker came in. Miss Hall went to her home Friday or Saturday, I could not say which day."

Mrs. George Hall, the mother of Ruth, testified as follows:

"Ruth was working for the Southwest Bell Telephone Company, in April, 1932; she was rooming at 607 West Tenth street; Ruth came home every Saturday; we live at Bethany; her general condition of health was good the week prior to the Saturday her brother went in and brought her home; she was sick when she reached home about 4 or 5 o'clock in the afternoon; I did not find out what the trouble was until about 11 o'clock; I called Dr. Vaughn, our regular physician; he did not give her a treatment; later I talked with him over the phone.

"When I phoned defendant, I stated: 'This is Mrs. George Hall, at Bethany. Do you remember a girl coming to your office by the name of Ruth Hall?' He said he did not remember her, that she was not there. 'Well' I said, 'She is sick and we want you to come out and see her.' He said, 'What is the trouble,' and I said, 'You know what is the matter with her, come out right away.' He said, 'I haven't got any way to get out there.' I told him I could tell him a way. He said he would have to get a taxi. I did not care how he got there, all I wanted was for him to come. He acted like he was not going to come, and I said, 'You will wish you had. You had better come on out here if you know what is good for you.'

"Defendant came out; my daughter was in a back bedroom, and I went with him to her room; I don't think he asked any questions about her physical condition; he

asked what was the matter; she smiled at him and did not say anything; he had taken her temperature and she did not have any fever at all.

"He opened up his case to get his instruments and started in like he was going to work on her without sterilizing his instruments or washing his hands; I asked him if he was not going to sterilize his instruments or wash his hands; he said, 'I guess I had better;' he washed his hands, but did not sterilize his instruments; he took out an instrument of some kind, and used that on her; he used that to dilate her vagina, then used a swab with cotton and stuck that in a bottle that contained iodine and swabbed her out with it; after he treated her he sat at the foot of the bed and talked with us for some time. He said, 'This is something I certainly do not approve of; I told the girl this when she came to the office and wanted help, but I could not turn her down. It seems like the more I try to help people lately the most of them get into worse trouble;' he said if his wife knew this 'she would kill me. I feel like sometimes going and jumping in the river, and if I had I would be better off.' He further said, 'Before I do anything like this again, the husbands will have to come with the wives, or the mothers with the daughters.'

"I asked him about getting another doctor, and he said he did not think it necessary. She died Friday evening. I called Dr. Vaughn, and he would not come. I called Dr. Ferris and defendant; Dr. Ferris got there first, then the defendant came. She was dead when defendant got there."

Over the objections of the defendant, the court permitted a number of witnesses to testify that defendant, subsequent to the abortion performed on Ruth Hall, had performed abortions on Robbie Lou Thompson, Lennis May Roach, and Nancy Joe Seay Lee, and permitted the witnesses to go into detail as to the condition of the parties named after it was claimed the abortions were performed, up to and including the death of each of them.

The defendant, testifying in his own behalf, admits that Ruth Hall came to his office, but denies he performed an abortion upon her, stating when she came to his office the abortion had been performed, and she told him the doctor who had performed it was out of the city, and she wanted him to treat her, and he did. He admits he was called to the home of Ruth Hall by her mother, but denies he made any statement directly or indirectly admitting he performed the abortion upon the deceased, Ruth Hall.

Defendant testified that a Mr. Erdman came with Robbie Lou Thompson to his office to consult him—

"I examined Miss Thompson and found her in rather a serious condition; I advised she be taken to a hospital immediately where she could have attention; they left my office, and about 12 o'clock in the night Mr. Erdman called and asked me to come out to Mrs. Moore's where they were stopping; when I got there they had gone; Erdman soon came back and told me Miss Thompson had died on the road to the hospital; he wanted me to make out the death certificate; he prevailed on me to falsify that a little bit in order to protect her; I made out the certificate showing she died from acute gastritis. I was never paid for my services. I did not operate on Miss Thompson.

"Frank Roach and Lennis May Roach came to my office several times; Mrs. Roach was in bad health and emaciated; she was suffering from leucorrhea discharge, and had pains in her lower abdomen and was in a bad condition; I treated her by using antiseptic tampons and giving her a tonic; I did not perform an abortion on Mrs. Roach."

Defendant further stated he first met Frank Lee some time about noon Saturday, April 23, 1932; he said his wife had chronic appendicitis, and had had it for a long time; he brought his wife to the office about 2 o'clock that afternoon—

"I treated her by putting a sedative into the vagina and had her take a laxative; I directed him to take her some place for observation, a hospital or a nurse; the purpose of this suppository or sedative tampon was intended to relieve the pain, and I followed it up with gauze, as it was literally necessary for something to retain it in the vagina; I did not examine her uterus; I never saw her after that time; I gave him the number of a place he could take her where the expense would be reasonable. I did not perform an abortion on Mrs. Lee."

Defendant, further testifying, stated that a sister of Miss Hall had threatened to have him prosecuted, demanding of him that he pay the funeral expenses, and he declined to do so, telling her he had done all he could for the girl. He stated when he left Oklahoma City he went to his brother-in-law's ranch near Amarillo, Tex., where he went under the assumed name of Miller. Later he went to Springdale, Ark., where he was arrested. Defendant testified he had arranged and was going to return to Oklahoma City the night after he was arrested in the afternoon.

All of the testimony introduced on behalf of the defendant is a denial of the performance of an abortion upon Ruth Hall, or either of the women mentioned in the record. The evidence with reference to the other abortions mentioned in the record as stated by the court, was introduced for the purpose only of showing the custom, schemes or plans, if any existed, or the unlawful intent or motive, or to explain a particular course of action. The court further stated to the jury that if it did not find such evidence as may have been admitted tending to connect the defendant charged with the case on trial, then it would be its duty to disregard the same.

Seventeen errors have been assigned by the defendant as grounds for reversal. The defendant has at length and urgently discussed the question of the admission of the evidence of other similar crimes committed by the defendant, and has presented a forceable argument in support of his objection to the admission of any evidence tending to show the defendant guilty of other crimes similar to the one upon which he was being tried. Defendant, in support of his contention that the court erred in admitting evidence with reference to other abortions that the state claimed had been committed by this defendant, cites Smith v. State, 5 Okla. Cr. 67, 113 Pac. 204, in which the court said:

"The issue on a criminal trial is single, and the testimony should be confined to the issue; and on trial of a person for one offense the prosecution cannot aid the proof against him by showing that he committed other offenses."

The defendant admits there are exceptions to this rule, but insists that the evidence in this case does not bring the defendant within the exceptions of the rule, and that the evidence admitted was prejudicial to the rights of the defendant, and that the admission of the testimony of other abortions was sufficient to reverse the case and grant him a new trial.

It is not disputed that in this case it was necessary for the state to prove to the jury, beyond a reasonable doubt, all of the material elements of the crime in order to constitute murder. It was necessary for the state to prove that the deceased died from the result of the abortion performed on her by this defendant. It was also incumbent upon the state to prove that defendant committed an assault with some kind of an instrument into

the private parts of the deceased, and that the purpose of such was to produce an abortion and that an abortion resulted therefrom, and that the abortion was the proximate cause of the death of Ruth Hall, and that deceased was pregnant at the time and it was not necessary to perform the abortion in order to save the life of the deceased. However, the state is not required to prove this element by positive testimony, but may show it by circumstantial evidence.

The defendant further urges that the admission of testimony of other abortions, as shown by the record, does not come within any exceptions to the general rule—citing Emerson v. State, 18 Okla. Cr. 109, 193 Pac. 743, and Clark v. Commonwealth, 111 Ky. 443, 63 S. W. 740.

The question of the admission of the abortions performed on the parties named in the record within a short while after the abortion alleged to have been performed on Ruth Hall, which brought about her death, seems to be the most important question relied upon by the defendant for a reversal. The defendant in his argument urges an abortion had already been performed upon Ruth Hall before she came to his office. The state's testimony contradicts this fact. In fact the defendant's testimony is in direct conflict with all the testimony introduced by the state on the question of whether or not the defendant in this case performed an abortion on Ruth Hall. The theory of the state in its evidence of abortions performed on others shortly after the abortion was performed on Ruth Hall is that it tends to show the method and practice of the defendant, and further tends to show that the defendant was engaged in the practice of performing abortions upon women who became pregnant and did not desire to have the disgrace of it becoming known. The state insists

that the proof of separate abortions performed by the defendant shortly after the alleged abortion on Ruth Hall, and the method employed to perform them, was practically identical as used on Ruth Hall.

The state insists that the proof of separate abortions performed by the defendant on other women, occurring shortly after the alleged abortion on Ruth Hall, is admitted to show the methods employed to perform them were practically identical in each case. The state urges that the evidence of other abortions shows conclusively that defendant was a professional abortionist, and the state further urges that he employed a certain treatment in producing an abortion, and when he treated Ruth Hall he intended to produce an abortion and not merely a vaginal treatment, and that any evidence relevant in proving such abortion was accomplished, and proof of the system employed by defendant in every instance of the other abortions tends to establish the fact that an abortion was performed by the same treatment in this case as in the others —citing the following authorities to sustain its position: State v. Rule, 11 Okla. Cr. 237, 144 Pac. 807; Johnson v. State, 35 Okla. Cr. 212, 249 Pac. 971; Beach v. State, 28 Okla. Cr. 348, 230 Pac. 758; Jackson v. State, 42 Okla. Cr. 86, 274 Pac. 696; Winfield v. State, 44 Okla. Cr. 232, 280 Pac. 630.

In Davis v. State, 30 Okla. Cr. 61, 234 Pac. 787, this court, in the fifth paragraph of the syllabus, said:

"An exception to the rule of evidence that evidence of other offenses cannot be introduced to establish the commission of the offense charged arises where the other offense or offenses tend to identify the accused with the offense charged; or where such testimony is for the purpose of showing that the offense charged was a part of a system or common scheme or plan, including other like

offenses; or where proof of a separate offense is explanatory of the motive or intent of the offender in the commission of the crime charged."

The Davis Case is a case where the defendant was charged with the same crime as the defendant in this case, that is, of having performed abortions, from the effects of which the women aborted died. In the Davis Case the question was discussed at length as to the admission of certain documents found in the possession of the defendont and calling of witnesses to show that Dr. Davis had performed abortions upon other women. It was urged by the defendant that this testimony was inadmissible, as not being connected with the case. The same question is urged by the defendant in this case, that the court erred in admitting evidence of the abortions at different times upon other women. The admission of this testimony, as stated by the court, was for the purpose only of showing the custom, schemes or plans, if any existed, or the unlawful intent or motive, or to explain a particular course of action, and the court specifically advised the jury that if it did not find such evidence as may have been admitted tending to connect the defendant with the crime, then it was its duty to disregard the same. The defendant earnestly urges the admission of the testimony of the abortions upon other women as sufficient grounds for reversal of this case.

In the case of Fowler v. State, 8 Okla. Cr. 130, 126 Pac. 831, this court held:

"Before this court can reverse a conviction upon the ground that the trial court erred in the admission or rejection of evidence, or in its instructions to the jury, we must further find, from an inspection of the entire record, that appellant was injured thereby; and to determine this

issue the court must consider the question as to whether the appellant is guilty or innocent of the offense charged."

In Ford et al. v. State, 23 Okla. Cr. 46, 212 Pac. 444, 446, this court said:

"Great stress is placed on this assignment of error in the able brief filed in behalf of these defendants, and numerous cases are cited to the effect that the admission of such evidence was erroneous, bu it must be borne in mind that in this jurisdiction it is not error alone that authorizes this court to reverse judgments of conviction, but error plus injury, and in determining whether injury has probably resulted from the error complained of, this court will closely examine the record to determine the probable guilt of the defendants."

Davis v. State, supra, is in point, and following the holding in the Davis Case we do not think the court erred in admitting the evidence of abortions performed on other women about the same time or shortly thereafter it is alleged the abortion was performed on Ruth Hall. The state, over the objection of the defendant, after introducing testimony as to the abortions performed upon other women was permitted to show that the women aborted died shortly thereafter. The subsequent effect had upon the other women after the abortions were performed and their deaths, in the opinion of this court, was inadmissible, but when the facts and circumstances disclosed by the record are considered in detail, we hold that the admission of the testimony is not such an error as would warrant this court in reversing this case.

The testimony in this case, though conflicting, shows conclusively by the state's evidence, and the defendant's, that the women named, whom the state claims died from the effects of the treatment of defendant, had visited the defendant in his office, and the question of an abortion

had been discussed either by the women themselves with the defendant or those who accompanied them to the office. The evidence is sufficient to sustain the conviction.

The record further shows this defendant wholly disregarded his profession as a physician charged with the duty of carefully examining and treating his patients; that he did not take the pains to look after them, or make any further inquiry about them after they left his office; and it conclusively shows that the defendant was a professional criminal abortionist of such type that he is not entitled to be considered a reputable physician. The jury heard the evidence and decided that the defendant was guilty. This court has repeatedly held that where there is any competent evidence to sustain the conviction it would not disturb the judgment.

The defendant was accorded a fair and impartial trial. The evidence is sufficient to sustain the conviction. There are other errors assigned, but they do not possess sufficient merit to warrant a reversal. The judgment of the trial court is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.