The STATE of Oklahoma, Appellant,

v.

Wayne THOMASON, Appellee.

No. O–74–266.

Court of Criminal Appeals of Oklahoma.

July 18, 1975.

James Clark, Dist. Atty., Thomas R. Carlock, Asst. Dist. Atty., Love County, for appellant.

Charles A. Milor, Ardmore, for appellee.

## OPINION

BUSSEY, Judge:

 Appellee, Wayne Thomason, hereinafter referred to as defendant, was charged in the District Court, Love County, Case No. CRF–74–4, with the offense of Second Degree Forgery. This is an appeal by the State from the adverse ruling of the trial court below, which upon hearing overruled a motion filed in behalf of the State to require that defendant furnish a handwriting exemplar. We have accepted jurisdiction of this appeal as upon a reserved question of law under the provisions of 22 O.S.1971, § 1053, pàragraph 3.

The sole assignment of error properly presented to this Court on appeal is that the trial court erred in refusing to compel the defendant to furnish a handwriting exemplar to the State. However, we recognize this assignment to encompass three propositions of law, which are as follows: (1) the self-incrimination clause embodied in the Oklahoma Constitution is not broader than that contained in the United States Constitution; (2) a handwriting sample or exemplar is not included within the constitutional privilege against self-incrimination; and, (3) to the extent that the handwriting characteristics of a suspect or accused are relevant, the State may cause the trial court to compel him to furnish a reasonably sufficient specimen of his handwriting for comparative purposes upon penalty of contempt.

We first observe that the court below placed some emphasis upon the particular wording of our State constitutional provision upon self-incrimination. Article 2, § 21, of the Oklahoma Constitution provides insofar as pertinent that:

"No person shall be compelled to *give evidence* which will tend to incriminate him . . ."

Whereas, the Fifth Amendment to the United States Constitution provides in pertinent part that:

"No person . . . shall be compelled in any criminal case to be a *witness against himself* . . ."

Except for Iowa and New Jersey, each State in the Union has a constitutional provision upon self-incrimination, and of

these, one-half or 24 States including Oklahoma, employ terminology protecting one from being compelled to *give or furnish evidence* against himself. See, 8 Wigmore, Evidence, § 2252, page 319, n.3 (McNaughton rev.1961), for the citation of each constitutional provision. In that excellent and exhaustive analysis of this topic, the author states that:

".... The variety of constitutional and statutory phrasing neither enlarges nor narrows the scope of the privilege as developed in the common law. (§ 2252, page 326, footnotes omitted)

\* \* \* \* \* \*

"In the interpretation of the principle, nothing turns upon the variations of wording in the constitutional clauses; this much is now conceded. . . . It is therefore immaterial that the witness is protected by one constitution from 'testifying' or by another from 'furnishing evidence,' or by another from 'giving evidence,' or by still another from 'being a witness.' These various phrasings have a common conception, in respect to the *form* of the protected disclosure. . . .

\* \* \* \* \* \*

"The *history* of the privilege . . . especially the spirit of the struggle by which its establishment came about—suggests that the privilege is limited to testimonial disclosures. It was directed at the employment of legal process to *extract from the person's own lips* an admission of guilt, which would thus take the place of other evidence. That is, it was intended to prevent the use of legal compulsion to extract from the person a sworn communication of his knowledge of facts which would incriminate him. Such was the process of the ecclesiastical court, as opposed through two centuries—the inquisitorial method of putting the accused upon his oath in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath.

"Such, too, is the main thrust of the *policies* of the privilege . . . While the policies admittedly apply to some extent to nontestimonial cooperation, it is in testimonial disclosures only that the oath and private thoughts and beliefs of the *individual*—and therefore the fundamental sentiments supporting the privilege—are involved.

"In other words, it is not merely any and every *compulsion* that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial* compulsion. The latter idea is as essential as the former." (§ 2263, page 378 and 379, footnotes omitted, emphasis original)

This appears to have first been recognized prior to our statehood and the adoption of our constitution, when in 1891 the United States Supreme Court, in *Counselman v. Hitchcock,* 142 U.S. 547, 585–586, 12 S.Ct. 195, 206, 35 L.Ed. 1110, stated in part that:

"[W]here the constitution, as in the cases of Massachusetts and New Hampshire, declares that the subject shall not be 'compelled to accuse or furnish evidence against himself;' such a provision should not have a different interpretation from that which belongs to constitutions like those of the United States and of New York, which declare that no person shall be 'compelled in any criminal case to be a witness against himself.' . . .

\* \* \* \* \* \*

"It is contended on the part of the appellee that the reason why the courts in Virginia, Massachusetts, and New Hampshire have held that the exonerating statute must be so broad as to give the witness complete amnesty is that the constitutions of those states give to the witness a broader privilege and exemption than is granted by the constitution of the United States, in that their lan-

guage is that the witness shall not be compelled to accuse himself, or furnish evidence against himself, or give evidence against himself; and it is contended that the terms of the constitution of the United States, and of the constitutions of Georgia, California, and New York, are more restricted. But we are of opinion that, however this difference may have been commented on in some of the decisions, there is really, in spirit and principle, no distinction arising out of such difference of language."

The United States Supreme Court later reiterated that observation when in *Schmerber v. California,* 384 U.S. 757, n.6, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Court stated:

"Many state constitutions, including those of most of the original Colonies, phrase the privilege in terms of compelling a person to give 'evidence' against himself. But our decision cannot turn on the Fifth Amendment's use of the word 'witness.' '[A]s the manifest purpose of the constitutional provisions, both of the states and of the United States, is to prohibit the compelling of testimony of a self-incriminating kind from a party or a witness, the liberal construction which must be placed upon constitutional provisions for the protection of personal rights would seem to require that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation . . . .' *Counselman v. Hitchcock,* [*supra*] . . . "

Also in Weintraub, Voice Identification, Writing Exemplars and the Privilege Against Self-Incrimination, 10 Vand.L. Rev. 485 n.22 (1957), the author analyzes this issue and concludes that:

"[T]he cases concerning the question of when conduct on the part of an accused is improperly compelled suggest that the decisions, for the most part, have turned upon the courts' concepts concerning the privilege against self-incrimination rath-

er than upon variations in phraseology of state constitutions . . . ."

To the extent that this precise issue has been seriously addressed, other States with constitutional provisions upon self-incrimination similar to our own, recognize those provisions to simply be declaratory of the common law and reject the contention that *to give evidence* is broader in scope than the phraseology employed in the federal constitutional provision. See, *State v. Berg,* 76 Ariz. 96, 259 P.2d 261 (1953); *State v. Smith,* 8 Terry 334, 47 Del. 334, 91 A.2d 188 (Super.Ct.1952); *People ex rel. Hanrahan v. Power,* 54 Ill.2d 154, 295 N.E.2d 472 (1973); *Newman v. Stinson,* Ky., 489 S.W.2d 826 (1972); *State v. Roy,* 220 La. 1017, 58 So.2d 323 (1952); *Opinion of the Justices,* Me., 255 A.2d 643 (1969); *Brown v. State,* 233 Md. 288, 196 A.2d 614 (1964); *Olson v. State,* 484 S. W.2d 756 (Tex.Cr.App.1972); *Walton v. City of Roanoke,* 204 Va. 678, 133 S.E.2d 315 (1963); and, *State v. Moore,* 79 Wash. 2d 51, 483 P.2d 630 (1971). But to the contrary, see, *Wells v. State,* 20 Ala.App. 240, 101 So. 624 (1924), which was later seemingly abandoned in *Hubbard v. State,* 283 Ala. 183, 215 So.2d 261 (1968). To illustrate, in *Berg,* the Arizona Court stated in part that:

"The . . . provision of our constitution is in substance the same as one of the immunities guaranteed under the provisions of the Fifth Amendment to the Constitution of the United States. Every state in the Union has similar provisions with the exception of Iowa and New Jersey. Although slightly different in the language employed the courts uniformly hold that their meaning and purpose are the same. While there is a divergence of authority on the scope of evidence intended to be embraced in this constitutional immunity the better rule, we believe, is that it is limited primarily to testimonial compulsion, i. e., 'to extract from the person's own lips an admission of his guilt.'" (259 P.2d 263)

Also, in *Smith*, the Delaware Court there stated, in most pertinent part, that:

"This rule of privilege springs from the early common law. . . . A review of the history of privilege and the spirit of the struggle by which it was accomplished reveals the object of the protection to be only against the employment of legal process to extract from the person's own lips an admission of his guilt, which will thus take the place of other evidence. . . .

"The Federal Constitution and the Constitutions of the States, with two exceptions . . . have embodied within them the principle of privilege. These constitutional sanctions, however, were not new creations at the time of their adoption; rather, they represented the recognition of the common law rule of privilege, as it then existed, and are but declaratory thereof.

\* \* \* \* \* \*

". . . If the framers of our constitutional provision relating to the rule of privilege intended that it should extend beyond the common law application, such an intention should have been so expressed." (91 A.2d 191–192)

Further, in speaking of their state constitutional provision upon self-incrimination as compared to that embodied in the federal constitution, the Illinois Court, in *People ex rel. Hanrahan*, stated:

". . . The two provisions differ in semantics rather than in substance and have received the same general construction. . . ." (295 N.E.2d 475)

Additionally, in an excellent opinion written by Presiding Judge Onion, the Texas Court in *Olson* stated in part that:

"[W]e have found no historical evidence for appellant's position that the framers of our state constitution meant, by choice of language, for Article I, § 10, to be more encompassing than, 'witness against himself,' as used in the federal constitution or other formulations of the privilege then in existence in other states." (484 S.W.2d 762)

Finally, in *Moore*, the Washington Court reasoned in part as follows:

"Appellant presents an articulate argument for the proposition that we are not bound to place the same interpretation on our state constitutional privilege against self-incrimination as has been placed on that contained in the United States Constitution. He reasons that our provision, which is worded in terms of giving *evidence*, should be interpreted by this court to include physical evidence because our provision is meant to grant a broader protection than that granted by the Fifth Amendment. We are not persuaded, however, that the difference in language between the two constitutional provisions is determinative. While it may be granted that the words 'evidence' and 'witness' are not synonymous in terms of standard dictionary definition, this court must interpret specific words of the state constitution in consonance with the principles of law which they are used to express. In defining the parameters of the privilege against self-incrimination, the origins of this fundamental civil liberty are instructive:

"The privilege against self-incrimination is of ancient origin and when incorporated in the American constitution was hallowed by the traditions of the unremitting struggle in England against the tyranny of the Crown. The maxim *nemo tenetur seipsum prodere* (no one is bound to accuse himself) arose as a reaction against the ecclesiastical practice of inquisition, where the accused was required *ex officio* to take an oath to answer truly under inquisitorial interroga-

\* \* \* \* \* \*

". . . The Washington constitutional provision against self-incrimination envisions the same guarantee as that provided in the federal constitution. There is no compelling justification for its ex-

pansion. The protection of both constitutional provisions extends only to testimonial or communicative evidence. . . ." (483 P.2d 633–634 Emphasis original)

Our State Constitution was not adopted until Oklahoma was admitted as the 46th State to the Union in 1907, some 15 years after the United States Supreme Court, in *Counselman v. Hitchcock, supra,* had already specifically observed that in the various constitutional provisions upon self-incrimination, "there is really, in spirit and principle, no distinction arising out of such difference of language." We are also persuaded in that 22 O.S.1971, § 15, as originally adopted in 1890, prior to statehood during territorial days and thereafter maintained following the adoption of our State Constitution, provides insofar as pertinent that, "No person can be compelled in a criminal action to be a *witness against himself* . . ." As early as 1913 in *Scribner v. State,* 9 Okl.Cr. 465, 132 P. 933, which discusses at length the origin and history of the privilege against self-incrimination, we recognized that our State constitutional provision upon self-incrimination "is but a reiteration of the common law." We also find some persuasive force in another decision of this Court rendered that same year in *Stout v. State,* 36 Okl. 744, 130 P. 553 (1913), construing the meaning of "life or liberty," as contained in the double jeopardy provision of the same constitutional section now under examination, in comparison with the phrase "life or limb" as contained in the Fifth Amendment to the federal constitution and various other phraseologies adopted in other states. We at that early date held that:

"When our Constitution was adopted, similar provisions had been in the Constitutions of the United States and of the other states for many generations, and various phrases are used to express the same idea. . . .

\* \* \* \* \*· \*

"These various constitutional provisions apparently are treated by the courts as

meaning the same thing; the difference in phraseology not being discussed in the cases which we have examined. Indeed, it is [so] assumed by the Supreme Court of the United States, in the case of *Trono v. United States,* 199 U.S. 521, 26 S.Ct. 121, 50 L.Ed. 292, 4 Ann.Cas. 773, . . . We therefore conclude that no particular significance is to be given to the term, 'life or liberty,' in our Constitution, but that it has substantially the same meaning as the various other forms of expression which are contained in other Constitutions and bills of rights." (130 P. 556–557)

Also, only ten years later in the case of *Ricketts v. State,* 23 Okl.Cr. 267, 215 P. 212 (1923), we held that compelling an accused to surrender his shoes for use in comparision to foot tracks found near the scene of the crime did not infringe his privilege against self-incrimination, and in so holding reasoned that:

". . . The history of the constitutional provision referred to clearly demonstrates that it was not intended to reach a case like this. . . .

"The constitutional provision guarantees no greater privilege than that all persons, whether parties or extraneous witnesses, shall be free from compulsion by legal process, to give self-incriminating testimony. . . .

\* \* \* \* \* \*

"'. . . He is not, in such cases, giving evidence. He is not testifying as a witness. He is not delivering any testimonial utterance.'

\* \* \* \* \* \*

"'. . . Evidence of this sort called by the civilians "real evidence," is always admissible . . .'" (215 P. 213)

■ We are not unmindful that subsequent decisions of this Court indicate that a broader interpretation should be placed upon the particular language employed in our State constitutional provision upon self-incrimination. Noteworthy among

these decisions are *Cox v. State,* Okl.Cr., 395 P.2d 954 (1964) and *Spencer v. State,* Okl.Cr., 404 P.2d 46 (1965), but the principal case authority there relied upon from other jurisdictions with constitutional provisions similar to our own was later expressly or impliedly overruled in *Olson* and *Hubbard, supra.* Upon a thorough review and examination of this issue we are now of the opinion that such cases were nor resolved with the benefit of the foregoing authority. A literal interpretation of that provision would mean that an accused could not be required to take any affirmative action which would have the effect of yielding evidence tending to incriminate him. That interpretation would preclude the effective utilization of such identification procedures as fingerprinting, photographing, and requiring the defendant to appear in a lineup, all of which have previously been approved here and elsewhere. See, *Lester v. State,* Okl.Cr., 416 P.2d 52 (1966) and *Chandler v. State,* Okl.Cr., 501 P.2d 512 (1972). Further, we are now of the opinion that such an interpretation is not in consonance with the origin and history of the privilege, which reveal that the immunity was intended only to prevent the use of testimonial compulsion or the equivalent thereof and did not extend to the compelled use of real or physical evidence not equivalent to testimonial utterances.

 Although we consider the federal cases in this area highly persuasive, we reserve the right and authority to interpret and apply our own constitutional provision upon self-incrimination in a manner that does not infringe the federal Fifth Amendment privilege as made applicable to the states through the Fourteenth Amendment. See, *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). However, we now hold that the particular phraseology contained within our constitutional provision upon self-incrimination is simply declaratory of the common law and does not grant broader protection than that embodied within the Fifth Amendment to the federal constitution. Those cases so indicating to the contrary are hereby overruled.

 Proceeding now to consider whether a handwriting exemplar is included within the privilege against self-incrimination, we are of the opinion that this proposition has previously been firmly resolved in favor of the State. We have already recognized that the origin and history of the privilege in common law prohibited testimonial compulsion but did not preclude that compulsion making the suspect or accused the source of real or physical evidence. See, *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); 22A C.J.S. Criminal Law § 649, and 21 Am.Jur.2d Criminal Law, § 354. Further, in an opinion written by Presiding Judge Brett, this Court previously resolved this precise issue in *Smith v. State,* Okl.Cr., 462 P.2d 328 (1969). In paragraph 2 of the Syllabus to that decision we stated that, "The taking of handwriting exemplars does not violate defendant's constitutional rights." We therein applied *Gilbert v. California,* 388 U.S. 263, 266–267, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967), wherein the United States Supreme Court reasoned in part that:

" . . . The taking of exemplars did not violate petitioner's Fifth Amendment privilege against self-incrimination. ᴛ ne privilege reaches only compulsion of 'an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers,' and not 'compulsion which makes a suspect or accused the source of "real or physical evidence" . . . .' *Schmerber v. California,* 384 U.S. 757, 763–764, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908, [916]. One's voice and handwriting are, of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a commuication with-

in the cover of the privilege. A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection. *United States v. Wade, supra,* 388 U.S. [218], at 222–223, 87 S.Ct. [1926], at 1929–1930, [18 L.Ed. 2d 1149]. . . ."

■■ Turning now to the final proposition, we are of the opinion that while due process would require notice and an opportunity to be heard, as well as a showing that the handwriting characteristics of a suspect or accused were relevant to a prosecution or proceeding properly before the court, the State may upon motion cause the trial court to compel him to furnish a reasonably sufficient specimen of his handwriting for comparative purposes upon penalty of contempt. However, the State need not make a preliminary showing of probable cause since a compelled handwriting exemplar is not a search and seizure within the contemplation of the Fourth Amendment to the United States Constitution or Article 2, § 30, of the Oklahoma Constitution. See, Annot. 43 A.L.R.3rd, 653, Propriety of Requiring Accused to Give Handwriting Exemplar, for a collection of authority upon that subject. Further, in *United States. v. Mara,* 410 U.S. 19, 21–22, 93 S.Ct. 774, 775, 35 L.Ed.2d 99 (1973), the United States Supreme Court somewhat recently held that:

"We have held today in Dionisio [410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67], that a grand jury subpoena is not a 'seizure' within the meaning of the Fourth Amendment and, further, that that Amendment is not violated by a grand jury directive compelling production of 'physical characteristics' that are 'constantly exposed to the public.' . . . Handwriting, like speech, is repeatedly shown to the public, and there is no more expectation of privacy in the physical characteristics of a person's script than there is in the tone of his voice. . . . Consequently the Government was under no obligation here, any more than in Dionisio, to make a preliminary showing of 'reasonableness.'

". . . The specific and narrowly drawn directive requiring the witness to furnish a specimen of his handwriting violated no legitimate Fourth Amendment interest. . . ."

■ We observe that the ruling of the trial court in the instant case was partially premised on the fact that the State already had obtained the signature of the defendant upon two fingerprint cards. The State, however, advanced the explanation that this was not a sufficient sampling of the defendant's handwriting characteristics to permit an expert in that field to express an opinion upon handwriting similarity. While unjustified compulsion to provide irrelevant handwriting exemplars would in our opinion be violative of due process, we are of the opinion that the State advanced a reasonable explanation why that sampling within its possession was insufficient for comparative purposes, and that the right to probe this area for evidence necessarily grants the State the authority to sufficiently do so for the reasonable advancement of legitimate investigative interests. We therefore hold that the trial court erred in premising that ruling upon this bases. See, *United States v. Blount,* 315 F.Supp. 1321 (D.C.La.1970) and *United States v. Vignera,* 307 F.Supp. 136 (D.C. N.Y.1969).

This case is therefore remanded to the trial court below with directions that any further proceedings not be inconsistent with this opinion.

BLISS, J., concurs.